The STATE of Utah, Plaintiff and Appellee,

v.

Mark Deron HARRISON, Defendant and Appellant.

Case No. 890617–CA.

Court of Appeals of Utah.

Jan. 14, 1991.

Rehearing Denied Feb. 7, 1991.

Vernice S. Ah Ching, Elizabeth Holbrook (argued), Salt Lake Legal Defender Ass'n, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, State Atty. Gen., Sandra L. Sjogren (argued), Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Before BENCH, BILLINGS and GREENWOOD, JJ.

## OPINION

GREENWOOD, Judge:

Mark Deron Harrison appeals his jury conviction of manslaughter, a second degree felony, in violation of Utah Code Ann. § 76–5–205 (1990). We affirm.

## FACTS

At about 2:00 a.m. on April 9, 1989, Harrison shot and killed Grant Glover outside the Persepolis Club in downtown Salt Lake City. The shooting took place during a confrontation between two groups of people who had been posturing as if they were members of rival street gangs. Apparently, Harrison's group perceived Glover's group as "Crips," while Glover's group believed Harrison and company were "Bloods."

The confrontation had begun earlier in the evening. Harrison, his wife, and several friends were at the crowded club to celebrate the birth, one or two days earlier, of Harrison's second child. Harrison and his wife had been dancing. Returning to their table, they found their way blocked by Rodney Thomas, a professional football

player and member of Glover's group. Harrison tried to walk past Thomas, saying, "Excuse me, blood." Thomas, apparently drunk, and apparently insulted by being addressed as "blood," leaped from his chair and began to berate Harrison and his wife. Although Harrison, a non-drinker, denied responding in kind, he and Thomas had to be physically separated. Glover, also a football player and also drunk, apparently tried to join the quarrel, "woofing" at or shoving one of Harrison's companions. Bouncers then asked Glover and Thomas to leave the Persepolis; as they left, they were joined by Glover's brother, Dino, and another companion.

Although not expelled from the club, Harrison and three male companions also exited, leaving Harrison's wife and the wife of another group member inside. Seeing Thomas across the street, the four men got into their car and drove away. At this point, a factual dispute related to this appeal arises. One of Harrison's companions, John Bray, testified that the four planned to get guns: Harrison was to get his pistol, while another companion got a shotgun. Harrison, however, testified that he already had a pistol with him, which he carried because of violent threats made against him in the past. Harrison was dropped off at his apartment, a few blocks from the Persepolis, and the others drove on for the shotgun. Harrison claimed that his plan was to simply change from dress shoes into tennis shoes, then run back to the Persepolis and escort the women out, avoiding Glover's group. As he left the apartment, however, Harrison was hailed by his companions in the car. Their return was quicker than anticipated because they had realized, shortly after dropping Harrison off, that they would not be able to get the shotgun, because they did not have the key to the house where it was kept. The foursome drove back to the Persepolis.

Glover's group was still outside the Persepolis when Harrison's group returned. Glover and his friends taunted Harrison's group. Someone exclaimed that Harrison had a gun, and Glover reportedly boasted, "I can beat a gun." A beer bottle was smashed on the sidewalk. Harrison and his friends went inside. Harrison had just returned to the wives' table when someone—either Harrison or one of his friends—signalled that they should return outside. The foursome did so, and the deadly, final confrontation ensued.

Facing off outside the Persepolis, the opposing groups exchanged street slang indicating gang membership, although Harrison himself apparently made no such utterances.[1] Bray prepared to fight one of Glover's companions. Glover challenged Harrison to fight.[2] He advanced on Harrison; Dino Glover reported that his brother was alternately snapping his fingers and hitting one hand into the other as he advanced. Another witness described Glover's movements as "street bluffing," an attempt to give the impression of having a gun. Although no gun was recovered from Glover, Harrison claimed at trial that he saw Glover pulling a nickel-plated revolver from his waistband. Terron Horton, another member of Harrison's group, testified at trial that he saw Glover reaching for a "chrome object" in his waistband. Stepping back and shouting "Stop!" or "Stop, blood!," Harrison drew his pistol and fired the fatal shot.

Harrison and his friends ran from the scene. Terron Horton then went back to the Persepolis and picked up the women. At trial, Horton testified that, while on his way back to the Persepolis, he encountered one of Glover's companions brandishing a "chrome gun." The encounter was apparently brief, Glover's friend demanding to know if Horton had shot Glover, Horton replying that he had not. The "chrome

1. Members of Glover's group identified themselves as "Compton C.C. Rider" and "83rd Street Gangster Crip," indicating Crip membership, while Harrison's companion Bray said, "This is Parue, Blood." Harrison denied ever having been a member of a street gang, although this testimony was contradicted by other witnesses.

2. Glover used the street slang, "Do you got any beef run up?" Witness testimony was that this means, "Are you ready to fight?"

gun" was never recovered; nor was the person who allegedly confronted Horton ever identified.

Harrison's gun was recovered when he was arrested on suspicion of shooting Glover the following afternoon. The arrest took place as Harrison and his wife were walking their newborn and eleven month-old babies near Harrison's apartment. The arresting officers ordered the couple down on the sidewalk and searched them. At a suppression hearing, Mrs. Harrison testified that one of the officers then, without consent, searched the diaper bag that had been carried on the babies' stroller and found the gun. The officer testified that she had merely looked inside the open bag and patted it down, felt a gun-shaped object in an inside zippered pocket of the bag, and reported this to officers taking Mrs. Harrison to the Salt Lake City Public Safety Building. A detective at the public safety building then asked Mrs. Harrison if he could search the bag, and she consented. Mrs. Harrison claimed that she only consented to the detective's search because she believed the gun had already been discovered and, therefore, refusing consent would be futile. The trial court, finding that Mrs. Harrison's consent to search the bag at the public safety building was voluntarily given, denied Harrison's motion to suppress the gun.

Harrison was charged with second degree murder and tried before a jury in August 1989. Harrison, who is black, objected to the State's use of peremptory challenges to strike two Hispanic-surnamed women from the jury. The objection was raised immediately after the jury was sworn. Harrison asserted that the two women were the only apparent minorities on the panel, and that the State's striking them amounted to the systematic exclusion of minorities from the jury.

The trial court asked the prosecutor to explain the challenges. The prosecutor denied racial motivation, explaining that the women had instead been challenged on the basis of gender, in an effort to attain a gender-balanced jury. Each woman had been, when stricken, the woman the prosecutor had least preferred, "for whatever reason." The court noted that one of the stricken jurors had been the only member of the original panel who had "appeared assured of a minority race;" a non-Hispanic-named juror remaining on the jury appeared as likely to be a minority member as did the other stricken Hispanic-named juror. Accepting the prosecutor's explanation of the peremptory challenges, the court denied Harrison's objection. The jury, consisting of five women and three men, was then seated, and the excused panel members were dismissed.

At trial, Harrison admitted shooting Glover, but claimed he had done so in self-defense. To impeach John Bray's trial testimony that Harrison had left the Persepolis to get a gun following the first encounter with Glover's group, Harrison attempted to introduce Bray's testimony at a preliminary hearing. The trial court, however, found the prior testimony to be "likely consistent" with Bray's trial testimony, and disallowed reading the prior testimony to the jury.

To buttress his assertion that he had carried the gun all evening, and had not gone back to his apartment to get it after the initial confrontation with Glover's group, Harrison sought to testify about a specific incident that had prompted his decision to carry the gun. Some two months before the Glover shooting, Harrison claimed that his car had been firebombed, and that he had been threatened by some Tongan Crips. Harrison was not allowed to testify about this incident, because the trial court found it too remote from the Glover confrontation; Glover and his companions were black, not Tongan, and there was no showing that there were Tongans at the Persepolis on the night Glover was shot. Harrison was allowed to testify that he carried the gun because of prior threats against him, but was not allowed to provide the details of the threats.

The State attacked Harrison's testimony that Glover was pulling a gun when shot. This attack centered on the fact that nothing in the investigation of the shooting suggested that Glover had been armed un-

til Harrison's and Horton's trial testimony. Horton claimed that he had not revealed his having seen the "chrome object" or the "chrome gun" to investigators earlier because he had not wanted to get involved in the case.

Harrison testified that, in the aftermath of the shooting, he had told his wife and the wife of one of his companions that Glover had had a gun. The friend's wife could not be located to corroborate Harrison's testimony at trial. Harrison's wife did not testify because of the marital privilege.[3] In closing argument, the prosecutor commented on Mrs. Harrison's unavailability, as a result of the privilege, to testify that Harrison had told her that Glover had been armed. Harrison's objection to this comment was overruled.

Harrison objected to other prosecutorial conduct at trial. For example, the prosecutor pointed out that Harrison had not told investigating police about Glover being armed, but instead, had waited until trial to make this claim. Harrison also objected to the reasonable doubt instruction that was given to the jury.

The jury found Harrison guilty of manslaughter, a lesser included offense of the second degree murder charge. Harrison argues on appeal that: (1) the State's peremptory challenges violated the federal constitution's equal protection clause; (2) the refusal to allow testimony about the details of prior threats against him and the refusal to allow the reading of John Bray's prior testimony to the jury improperly compromised his defense; (3) the search of the diaper bag violated his rights against unreasonable search and seizure; (4) various comments and questions by the prosecutor violated his right to a fair trial; and (5) the reasonable doubt instruction given to the jury was improper.

3. Although the Harrisons claimed to be common law spouses before the shooting, their marriage was not formalized until after the shooting and before the trial.

4. The defendant is also "entitled to rely on the fact, as to which there can be no dispute, that

## ANALYSIS

### I. PEREMPTORY CHALLENGES

Harrison argues that the State's peremptory challenges violated the equal protection clause of the fourteenth amendment to the federal constitution. Analysis of this issue requires as many as five steps. First, does Harrison, a black, have standing to raise an equal protection objection to the exclusion of Hispanics from his jury? Second, was his objection timely raised before the trial court? Next, if timely raised, did Harrison establish a prima facie case of improper discrimination, requiring the State to explain its peremptory challenges? Fourth, if a prima facie case was established, was the prosecutor's explanation of the challenges adequate to support the trial court's finding that there was no improper racial discrimination? Finally, if the State's peremptory challenges were improper, was such impropriety prejudicial to Harrison?

*Standing.*

■ The underpinning for Harrison's argument is *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Batson* set the standards for determining when a prosecutor's peremptory juror challenges violate the equal protection clause. Under *Batson*, a prima facie case of improper discrimination in the exercise of peremptory challenges is raised by showing (1) that defendant is a member of a cognizable racial group; (2) that the prosecutor used peremptory challenges to remove members of defendant's race from the jury panel; and (3) that these facts and other relevant circumstances raise an inference that the panelists were removed because of their race. 476 U.S. at 96, 106 S.Ct. at 1723; *see also State v. Cantu*, 750 P.2d 591, 595–97 (Utah 1988) ("*Cantu I*") (explaining *Batson*).[4]

peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' " *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723 (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953)).

The first two elements of a *Batson* prima facie case appear to require racial identity between an accused and peremptorily stricken jurors, and some courts have held that such identity is required before a *Batson* equal protection objection can be raised.[5] However, the United States Supreme Court recently reserved judgment on this issue, in *Holland v. Illinois*, 493 U.S. ——, 110 S.Ct. 803, 811 & n. 3, 107 L.Ed.2d 905 (1990).[6] In fact, four members of the present Court have indicated their belief that lack of racial identity should not bar such an objection. *Id.*, 110 S.Ct. at 811–12 (Kennedy, J., concurring); 813–14 (Marshall, J., dissenting, joined by Brennan (now retired) and Blackman, JJ.); 820–22 (Stevens, J., dissenting).

In his *Holland* dissent, Justice Marshall pointed out that a criminal defendant, in making a *Batson* objection to peremptory challenges, is asserting more than his individual interest in being tried by a jury from which members of his own race have not been wrongfully excluded. Such a defendant raises "not only his rights, but also those of the members of the venire and of the general public." *Id.* at 813–14 (Marshall, J., dissenting). A *Batson* objection asserts the rights of potential jurors to not be excluded from the jury on account of race, *Batson*, 476 U.S. at 87, 106 S.Ct. at 1718, as well as the public's interest in preserving confidence in the fairness of our justice system. *Id.* Justice Kennedy added, "To bar the [equal protection] claim whenever the defendant's race is not the same as the juror's would be to concede that racial exclusion of citizens from the duty, and honor, of jury service will be tolerated, or even condoned." *Holland*,

110 S.Ct. at 811–12 (Kennedy, J., concurring).

The question of whether a defendant who does not share racial identity with the stricken juror(s) has standing to raise a *Batson* equal protection objection to a prosecutor's peremptory challenges is now pending before the Supreme Court, in *Powers v. Ohio*, —— U.S. ——, 110 S.Ct. 1109, 107 L.Ed.2d 1017 (Feb. 20, 1990) (granting certiorari). *Holland*, however, suggests that in *Powers*, the Court will reject racial identity with excluded jurors as a standing requirement for such objections.

We also note that in the present case, even though Harrison and the peremptorily excluded jurors are not of the same race, they do share racial minority status. Like Harrison, a black man, the excluded jurors, Hispanics or Hispanic-surnamed people, belong to a racially cognizable group for purposes of *Batson* equal protection analysis. *Cantu I*, 750 P.2d at 596 (citing *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), and *Fields v. People*, 732 P.2d 1145, 1153 (Colo.1987)). The existence of shared though not identical minority status, plus the likelihood that racial identity will be rejected as a prerequisite for raising a *Batson* objection to the exercise of peremptory challenges, persuades us that Harrison has standing, on equal protection grounds, to object to the State's peremptory challenges in this case.

*Timeliness.*

The State invites us to reject Harrison's objection to the prosecutor's peremptory challenges because it was not raised until after the jury was sworn, and was therefore untimely under section 78–46–16(1)

---

5. *See, e.g., United States v. Rodriguez–Cardenas*, 866 F.2d 390, 392 (11th Cir.1989); *United States v. Townsley*, 856 F.2d 1189, 1190 (8th Cir.1988) (en banc); *United States v. Angiulo*, 847 F.2d 956, 984 (1st Cir.1988), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332; *United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir. 1987). Our review of these cases reveals that their holdings on this issue are simply based on recitations of *Batson's* racial identity language, without analysis. We, however, are wary of standing analyses that are so "insufficiently sen-

sitive to ... legitimate policy considerations." *In re J.W.F.*, 145 Utah Adv.Rep. 17, 18 (1990).

6. *Holland* held that a white defendant did have standing to object, on sixth amendment "fair cross section" grounds, to the use of peremptory challenges to exclude blacks from the jury that tried him. 110 S.Ct. at 805–06. However, the Court then held that the fair cross section requirement, applicable to the venires from which jurors are selected, does not extend to the use of peremptory challenges in selecting the actual trial jury.

(Supp.1990) of Utah's Jury Selection and Service Act. That section states, with our emphasis:

■ Within seven days after the moving party discovered, or by the exercise of diligence could have discovered the grounds therefore [sic], and in any event before the trial jury is sworn to try the case, a party may move to stay the proceedings or to quash an indictment, or for other appropriate relief, on the ground of substantial failure to comply with *this act* in selecting a grand or trial jury.

■ We first note that the State's objection to the timeliness of Harrison's objection is itself untimely, appearing nowhere in the record of the trial court proceedings. More important, however, is the fact that Harrison's objection was not made under "this act," i.e., the Jury Selection and Service Act, but was instead based on the federal constitution.

In *State v. Tillman,* 750 P.2d 546 (Utah 1987), our supreme court noted that constitutional objections to jury panels fall outside the framework of the Jury Selection and Service Act. *Id.* at 574 n. 115.[7] Harrison's objection to the State's peremptory challenges was constitutionally based, and therefore was not barred by the time constraint of section 78–46–16(1).

■ Although not argued by the State nor Harrison, we find that Utah R. Crim. P. 18 is applicable to Harrison's constitutionally-grounded objection to the State's peremptory challenges. Rule 18(c)(2) states that challenges to an individual juror "may be made only before the jury is sworn to try the action, except the court may, for good cause, permit it to be made after the juror is sworn but before any of the evidence is presented." While the trial court did not explicitly find good cause for allowing consideration of the objection on its merits, it did so implicitly by allowing counsel to proceed with their arguments. Har-

rison's objection was made and argued immediately after the jury was sworn in, before the challenged jurors were excused from service, and before opening statements of counsel. *Cf. State v. Bankhead,* 727 P.2d 216, 217 (Utah 1986) (per curiam) (pre-*Tillman* case: constitutional objection to jury selection untimely under section 78–46–16(1) where not raised until after all evidence was presented to jury).

■ Further, Harrison met the requirement of raising and obtaining a ruling on his constitutional objection in the trial court, to preserve it for appeal. *Salt Lake County v. Carlston,* 776 P.2d 653, 655–56 (Utah Ct.App.1989). We find that Harrison's objection to the peremptory challenges was timely and therefore proceed to the merits of his argument.

*Prima Facie Case.*

Setting aside any requirement of racial identity between a defendant and challenged jurors, a prima facie case of racial discrimination in the exercise of peremptory challenges is raised when the relevant facts and circumstances surrounding the challenges raise the inference that they were used to exclude potential jurors because of their race. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722; *Cantu I,* 750 P.2d at 597. Once such a prima facie showing is made, the state must provide a race-neutral explanation, related to the case being tried, for its peremptory challenges. *Batson,* 476 U.S. at 97–98, 106 S.Ct. at 1723–1724. The explanation must also be clear, reasonably specific, and legitimate. *State v. Cantu,* 778 P.2d 517, 518 (Utah 1989) ("*Cantu II*").

■ Here the State argues that Harrison failed to raise a prima facie case because he made no showing, beyond the fact that they had Hispanic surnames, that the stricken jurors were members of any racial minority. However, our review of the record reveals that, in an earlier objection

7. The Utah Supreme Court's determination was based upon review of the United States Senate report on the analogous Federal Jury Selection Act, 28 U.S.C. § 1867 (1982). That report indicated that the federal act's procedures for ob-

jecting to jury selection applied only to alleged violations of the act and not to constitutional objections. S.Rep. No. 891, 90th Cong., 1st Sess. 35 (1967) (*quoted in Tillman,* 750 P.2d at 574 n. 115).

to the composition of the venire from which the jury was selected, the trial court observed that the jurors in question, along with three others, did appear to be members of racial minorities.[8] We agree with Harrison that more detailed inquiry into the race of peremptorily challenged jurors is unnecessary in the context of a *Batson* equal protection objection, and find that the minority status of the challenged jurors was adequately established.[9]

A prima facie showing of the improper use of peremptory juror challenges requires more than simply showing that one or more minority jurors were peremptorily stricken, however. *Batson*, 476 U.S. at 101, 106 S.Ct. at 1725 (White, J., concurring); *Cantu I*, 750 P.2d at 597. The *Batson* Court gave only sparing, "illustrative" guidance as to what other relevant circumstances give rise to a prima facie case: "[A] 'pattern' of strikes against [minority] jurors might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose." 476 U.S. at 97, 106 S.Ct. at 1723.

It is doubtful that Harrison showed a pattern of minority juror strikes here. Two other possible minority jurors identified earlier by the trial court in fact served on the trial jury; the fifth minority juror was excused for cause, a hearing problem. Additionally, Harrison's argument that the prosecutor's voir dire of the peremptorily challenged jurors was suspiciously sparse was not made to the trial court. It appears, therefore, that Harrison did not establish a prima facie case of improper peremptory juror challenges, and that the trial court need not have asked the prosecutor to give race-neutral reasons for the challenges.

The State, however, did not argue to the trial court that Harrison had failed to make out a prima facie case. Instead, the prosecutor sought to rebut Harrison's allegation by giving race-neutral reasons for the questioned peremptory challenges. The *Batson* Court indicated that "prima facie burden of proof rules" developed in cases brought under Title VII of the Civil Rights Act of 1964 may apply to the analysis of peremptory juror challenges. *Batson*, 476 U.S. at 94 n. 18, 106 S.Ct. at 1722 n. 18. In one such case, *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the Court noted that once a party accused of improper discrimination attempts to rebut that accusation with evidence that the challenged action was proper, the question of whether a prima facie case was made in the first place "is no longer relevant." *Id.* at 715, 103 S.Ct. at 1482. Instead, the focus shifts to the ultimate issue of whether improper discrimination has occurred. *Id.* at 715–16, 103 S.Ct. at 1481–82. Similarly, the issue of whether Harrison made out a prima facie case of improper discrimination in the State's peremptory challenges became irrelevant when the prosecutor failed to contest it at trial. We therefore proceed to the next step of our analysis, the question of whether the State adequately rebutted Harrison's allegation of improper use of peremptory challenges, and whether the trial court erred in ultimately finding that the challenges were not racially motivated.

*Adequacy of the State's Rebuttal.*

■ Despite the burden shifting under the prima facie showing rules just de-

---

**8.** In denying Harrison's objection that the venire appeared to underrepresent minorities, the trial court identified five of the thirty-two venire members as potential minority members. This identification was based upon appearance and upon surnames.

**9.** While we are disinclined to find that minority status can be established solely from one's surname, *but see Cantu I*, 750 P.2d at 596, we also recognize that a prosecutor bent on racial dis-

crimination is unlikely to make inquiries to confirm a juror's suspected minority status before improperly using a peremptory challenge to exclude the juror. Because *Batson* and its progeny seek to prevent the exercise of peremptory challenges with the *intent* or *purpose* to eliminate jurors solely because of race, it appears to us that concrete proof of the actual race of the jurors so challenged is, at most, of secondary importance.

scribed, the burden of showing racial discrimination in a prosecutor's use of peremptory juror challenges remains on the defendant. *Batson*, 476 U.S. at 93, 106 S.Ct. at 1721. Therefore, once the prosecutor gives race-neutral reasons, related to the case, for the peremptory challenges,[10] it is proper, as was done here, to allow the defendant to attack the credibility of those reasons. In the end, however, the trial court's finding on whether the challenges were racially motivated turns largely on credibility, and is entitled to great deference on review. *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21; *Cantu II*, 778 P.2d at 518; Utah R.Civ.P. 52(a).

In asserting that the objected-to peremptory challenges were gender-based rather than racially motivated, the prosecutor failed to give race-neutral and case-related reasons for striking the Hispanic women, instead of other women, from the jury. The prosecutor's explanation that he simply liked the Hispanics less than the other potential female jurors, "for whatever reason," amounted to no more than an unsupported denial of racial discrimination, and was a legally inadequate rebuttal. *See Batson*, 476 U.S. at 98, 106 S.Ct. at 1724 (prosecutor cannot rebut allegation of improper discrimination merely by denying discriminatory motive).[11]

■ However, even though the State's rebuttal of Harrison's allegation was inadequate, we do not believe that we are compelled to find clear error in the trial court's conclusion that the peremptory challenges were not racially motivated. We have already noted Harrison's failure to raise a prima facie case of improper peremptory challenges. Although the question of whether a prima facie case was made became irrelevant when the State offered reasons for its peremptory challenges, it remained proper for the court to consider all relevant facts and circumstances surrounding the State's peremptory challenges in ultimately determining whether they had been racially motivated. The absence of a pattern of minority strikes supported the trial court's finding that the strikes were not racially motivated. Indeed, in ruling on Harrison's objection, the court noted that at least one juror of apparent minority origin remained on the jury. Additionally, the court was free to accept as credible the prosecutor's assertion that the challenges were made in an effort to obtain a gender-balanced jury. Therefore, there was no clear error in finding that the State's peremptory challenges were not racially motivated.

Harrison claims, however, that in responding to his federal equal protection objection to the State's peremptory challenges, the State effectively admitted violating Utah Code Ann. § 78–46–3 (1987), which prohibits a citizen's exclusion from jury service on account of gender.[12] He also asserts that the State ran afoul of article IV, section 1 of the Utah Constitution, which states: "The rights of citizens

10. "[W]e emphasize that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723 (citations omitted).

11. While failing to specify why he challenged the Hispanic-surnamed women, the prosecutor actually gave a race-neutral and case-related reason that he could have used to justify a challenge to the other female, potentially Hispanic juror whom he actually left on the jury. He admitted to having been "a little bit worried" about this juror, who had a cousin who had been accused of murder. This kind of concern has been accepted in *Batson*-type objections to peremptory challenges. *See, e.g., United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir.1987) (juror had brother convicted of robbery). For other examples of peremptory challenge reasons that have been held adequate, see *United States*

*v. Angiulo*, 847 F.2d 956, 985 n. 37 (1st Cir. 1988); *People v. Talley*, 152 Ill.App.3d 971, 105 Ill.Dec. 800, 504 N.E.2d 1318, 1327 (App. 4 Dist. 1987); *Townsend v. State*, 730 S.W.2d 24, 26 (Tex.App.1987); *Grady v. State*, 730 S.W.2d 191, 194–95 (Tex.App.1987); *Chambers v. State*, 724 S.W.2d 440, 442 (Tex.App.1987).

12. "A citizen shall not be excluded or exempt from jury service on account of race, color, religion, sex, national origin, or economic status." Utah Code Ann. § 78–46–3 (1987). We note that this section might operate to limit, upon timely objection, some reasons for the exercise of peremptory challenges that have been otherwise approved. *See, e.g., Chambers, supra* note 11 (membership in "fringe" or "nonmainstream" religion); *Grady, supra* note 11 (juror had held current job only one year).

of the State of Utah to vote and hold office shall not be denied or abridged on account of sex. Both male and female citizens of this State shall enjoy equally all civil, political and religious rights and privileges."

■ Harrison's objection to the gender basis of the State's peremptory challenges was not raised in the trial court. Because this objection includes a constitutional basis, we could consider it for the first time on appeal if we were to find that it has an impact on Harrison's liberty. *State v. Anderson,* 789 P.2d 27, 29 (Utah 1990); *Salt Lake County v. Carlston,* 776 P.2d 653, 655 n. 5 (Utah Ct.App.1989). However, because this case involves neither plain error, *Anderson,* 789 P.2d at 29, nor exceptional circumstances, *Jolivet v. Cook,* 784 P.2d 1148, 1151 (Utah 1989), *cert. denied,* — U.S. —, 110 S.Ct. 751, 107 L.Ed.2d 767 (1990), and does not impact Harrison's liberty, we decline to consider it now.[13]

In *Anderson,* the Utah Supreme Court declined to consider a constitutional objection to a criminal sentence that had not been raised in the trial court, because the claimed error did not satisfy the "obviousness" requirement for plain error. 789 P.2d at 29.[14] That is, the alleged error was not one that should have been recognized by the trial court when it occurred. *Id.* Here, given that Harrison's trial jury had five women, the use of peremptory challenges to keep additional women from being seated could not have been obvious error. Nor has it been determined by Utah courts whether gender-based peremptory challenges are constitutionally or statutorily impermissible, so permitting such challenges was not obvious error. *See Carlston,* 776 P.2d at 655 (declining to express view on appropriateness of gender-based peremptory challenges).[15]

The *Jolivet* court did not articulate the meaning of "exceptional circumstances." However, in *State v. Webb,* 790 P.2d 65 (Utah Ct.App.1990), this court indicated that exceptional circumstances are those which would explain and excuse a party's failure to raise a claimed error in the trial court. *Id.* at 78. Here, as with the appel-

---

**13.** We note a recent Utah Supreme Court opinion suggesting that when a constitutional question involving liberty is presented, the appellate court is "obliged" to consider it even though it was not raised in the trial court. *State v. Jameson,* 800 P.2d 798, 802 (Utah 1990). This "obligation" has not been evident in previous cases where Utah's appellate courts have refused to entertain constitutional challenges to criminal convictions, with incarceration (and therefore liberty) at stake, when those challenges had not been raised below. *See, e.g., Jolivet* (sentence challenged as cruel and unusual punishment); *State v. Van Matre,* 777 P.2d 459 (Utah 1989) (claiming due process violation); *State v. Pierce,* 655 P.2d 676 (Utah 1982) (per curiam) (claiming violation of state constitutional right to not give evidence against self); *State v. Winger,* 26 Utah 2d 118, 485 P.2d 1398 (1971) (claiming violation of fifth amendment right to silence); *State v. Webb,* 790 P.2d 65 (Utah Ct.App.1990) (claimed fourth amendment violation); *State v. Johnson,* 771 P.2d 326 (Utah Ct.App.1989) (claiming violation of federal and state constitutional prohibitions against unreasonable arrest). We believe that "the interest of predictability, accountability, and fairness" would be served by a more careful examination of when Utah's appellate courts will consider issues not raised in the trial courts. *Espinal v. Salt Lake City Bd. of Educ.,* 797 P.2d 412, 415–16 (Utah 1990) (Bench, Court of Appeals Judge, concurring). We further believe that the previously enunciated standards allowing first-time appellate review of issues are sufficiently liberal to provide appropriate redress, and are therefore troubled by a standard *requiring* review whenever a "liberty" interest is identified.

In *Espinal,* Judge Bench urged a standard requiring both a liberty interest *and* exceptional circumstances before addressing constitutional issues raised for the first time on appeal. That suggested standard was not adopted in *Jameson,* where a liberty interest alone was apparently found sufficient to allow review. In this case, we do not find a liberty interest at stake because of the remoteness of the gender bias issue to Harrison's main claim of improper racial motivation. *See also* note 15, *infra.* The issue, as presented, has more to do with the public interest in a fair justice system than it does with Harrison's liberty.

**14.** The other requirement for plain error is that the error be harmful. *Anderson,* 789 P.2d at 29.

**15.** Because Harrison failed to show obvious error, we need not consider whether he was harmed by the State's use of peremptory challenges to limit the number of women on the jury. We seriously doubt, however, that Harrison could demonstrate a reasonable likelihood of a more favorable result had he been tried by a jury including six or seven women, as opposed to five.

lant in *Webb*, we find "nothing in the record to suggest" that the gender discrimination objection to the State's peremptory challenges now raised by Harrison "was unknown or unavailable to him" at trial. *Id.* Absent such circumstances explaining Harrison's failure to timely raise this objection, our entertaining it now would encourage a practice of withholding objections to jury selection until after an adverse verdict is returned, which we have previously refused to do. *See Carlston*, 776 P.2d at 655–56.

### Prejudice.

Because we have determined that the trial court did not clearly err in finding no racial discrimination in the State's peremptory challenges, we do not reach the issue of whether Harrison was prejudiced by those challenges. However, if we had found clear error, Harrison's conviction could be affirmed only by showing that the error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d ·705 (1967) (*quoted in Cantu I*, 750 P.2d at 597.)[16] This is a difficult showing to make, and prosecutors who are questioned in the future about possibly improper peremptory juror challenges would do well to consider this in formulating their responses, making sure that they meet the *Batson* requirements.

As things stand here, Mr. Harrison is not entitled to a new trial based upon the State's exercise of its peremptory challenges in choosing the trial jury.

### II. EXCLUSION OF EVIDENCE

We now turn to Harrison's contention that the exclusion of evidence about the

Crips firebombing and the trial court's refusal to allow the reading of an adverse witness's allegedly inconsistent prior testimony to the jury were improper.

On appeal, Harrison seeks to clothe these alleged errors in constitutional garb, claiming they amounted to a deprivation of his right to a fair trial.[17] However, he did not advance constitutional arguments to the evidence exclusion in the trial court. Accordingly, we limit our analysis to the Utah Rules of Evidence implicated by Harrison's arguments to the trial court.

In our analysis, we bear in mind the purposes for which the excluded evidence was offered by Harrison. Both items related to his contention that the shooting of Glover was justified as self-defense. This justification would be unavailable to Harrison if he were the aggressor in the confrontation, or if he engaged in "combat by agreement." Utah Code Ann. § 76-2-402(2)(c) (1990). If, as argued by the State, Harrison left the Persepolis to get his gun following the initial confrontation with Glover's group, this would tend to show that he was the aggressor, or that he agreed to fight Glover. These possibilities would be somewhat less likely if, as Harrison maintained, he had the gun with him all evening.

### Exclusion of the Firebombing Incident.

█ While relevant evidence is generally admissible, Utah R.Evid. 402, a trial court has broad discretion to determine whether proffered evidence is relevant, and we will find error in a relevancy ruling only if the trial court has abused its discretion. *Bambrough v. Bethers*, 552 P.2d 1286, 1290 (Utah 1976); *In re R.R.D.*, 791 P.2d 206, 212 (Utah Ct.App.1990). Additionally,

---

**16.** The burden required to show harmless state constitutional error is unsettled. *State v. Verde*, 770 P.2d 116, 121 n. 8 (Utah 1989). *But cf. State v. Eaton*, 569 P.2d 1114, 1116 (Utah 1977) (federal and state constitutional error alleged: reasonable doubt whether error was prejudicial should be resolved in favor of defendant).

There is old authority suggesting that a conviction by an illegally-constituted jury is null. *See State v. Bates*, 22 Utah 65, 61 P. 905 (1900) (conviction by eight-person jury under state law, where alleged offense occurred before state-

hood and therefore required trial before federally mandated twelve-person jury, was null). If this standard applied here, and Harrison's jury had been found to be illegally selected, a new trial would apparently be required regardless of any showing of prejudice.

**17.** Harrison invokes the fifth, sixth, and fourteenth amendments to the United States Constitution, as well as article I, section 7 of the Utah Constitution.

an erroneous evidentiary ruling will lead to reversal only if, absent the error, there is a reasonable likelihood that there would have been a more favorable result for the defendant. *State v. Johnson,* 784 P.2d 1135, 1140 (Utah 1989). A reasonable likelihood of a more favorable outcome exists when the appellate court's confidence in the verdict actually reached is undermined. *State v. Knight,* 734 P.2d 913, 920 (Utah 1987).

Harrison argued to the trial court that the firebombing by Crips two months before the Glover shooting was relevant to show that he had a reason to be, and therefore was, armed all evening, and to show that his state of mind, when confronted by more Crips at the Persepolis, was apprehensive rather than aggressive.[18] The trial court disagreed, finding the firebombing to be too remote in time and place from the Persepolis fracas. The court also found no connection, other than apparent Crips affiliation, between the firebombers and anyone present at the Persepolis when Glover was shot. While we believe this ruling was incorrect, it is unlikely that it adversely affected the verdict obtained by Harrison.

The Utah Supreme Court has taken the view that evidence tending to disprove criminal intent should be admitted, even if it is not particularly strong. *See State v. Smith,* 728 P.2d 1014, 1015–16 (Utah 1986) and cases cited therein (evidence of defendant's lack of motive to commit crime). Additionally, remoteness of a prior incident involving a litigant usually affects weight rather than admissibility. *Terry v. Zions Coop. Mercantile Inst.,* 605 P.2d 314, 323 n. 30 (Utah 1979). Here, Harrison's past victimization at the hands of Crips supported his assertion that he feared for his safety, and therefore routinely armed himself against a possible subsequent attack.[19] He should have been allowed to testify about the firebombing.

■ However, the trial court's refusal to admit evidence of the firebombing does not undermine our confidence in the trial verdict. Harrison was allowed to testify generally that he had been threatened two months before the Persepolis incident, and that he carried a gun because of these threats. The State did not attack the credibility of this particular testimony. Indeed, the conviction on the lesser included offense to the second degree murder sought by the State suggests that Harrison's self-defense claim was not entirely unsuccessful.

Harrison says he "might" have been acquitted altogether had he been allowed to testify about the firebombing. However, testimony about the bombing could have just as easily harmed Harrison: the jury could have believed he was armed not for self-protection, but for the purpose of waging war with Crips.[20] Relating his previous encounter with hostile Crips could have also impeached Harrison's trial testimony that he had never been affiliated with the rival "Bloods." Accordingly, Harrison's speculation that a more favorable verdict might have been reached had he been allowed to testify about the firebombing does not reach the level of a reasonable probability of a more favorable outcome.[21]

*Refusal to Allow Reading of Prior Witness Testimony.*

At trial, State's witness John Bray, one of Harrison's companions on the night of the shooting, testified that Harrison stated

---

18. The record indicates that Harrison was prepared to corroborate his firebombing story with police reports made in connection with that incident.

19. Even though remoteness can be a factor in deciding the relevance of a past incident, *Terry,* 605 P.2d at 323 n. 30, it does not appear to us that the firebombing, because of the frightening impact such an incident would have, could become irrelevant after only two months. Also, the bombing occurred at Harrison's home, within walking distance of the Persepolis.

20. The trial court noted this alternative inference in excluding Harrison's testimony. While it was for Harrison to decide whether to risk this alternative unfavorable inference to his self-defense claim, the possibility of such an inference weighs in our analysis of whether the error was prejudicial.

21. *Compare State v. DeAlo,* 748 P.2d 194, 199 (Utah Ct.App.1987) (conviction reversed where improperly admitted evidence was only evidence tending to show intent element of crime).

an intention to go get his gun after the initial confrontation with Glover's group at the Persepolis. At a preliminary hearing, Bray had testified that Harrison's group had left the Persepolis with the intention of getting guns, but may have admitted that Harrison had said no specific words to that effect. Asked about his preliminary hearing testimony at trial, Bray denied having made such an admission. The trial court refused to allow Harrison to read the relevant portions of the preliminary hearing transcript to the jury.

Rule 613(b), Utah Rules of Evidence, governs the use of extrinsic evidence to prove a trial witness's prior inconsistent statement. The rule has no application where the prior statement is not inconsistent with trial testimony. Here the trial court refused to admit Bray's preliminary hearing testimony because it found that his statements therein were not inconsistent with his trial testimony. This finding falls within the ambit of Utah R.Evid. 104(a), which provides that "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court, ..." [22] It is therefore a finding that we will not disturb absent clear error or abuse of discretion by the trial court.

■ The court noted that the only answer given in the preliminary hearing that might have contradicted Bray's trial testimony could have easily been caused by ambiguous questioning by defense counsel.[23] Our review of the record reveals lengthy and labyrinthine questioning of Bray, both at trial and at the preliminary hearing, on just what Harrison said, and when, regarding whether he left the Persepolis to get his gun after the initial con-

frontation with Glover and company. The trial court painstakingly examined Bray's testimony, considering his responses in the context of the questioning. Its finding that the preliminary hearing testimony was not inconsistent with Bray's trial testimony is not clearly erroneous, so we leave that finding undisturbed.

■ The trial court's exclusion of Bray's preliminary hearing testimony would have also been proper under Utah R.Evid. 403, which permits the exclusion of evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Valid considerations of confusion and waste of time were present here. We can affirm the trial court's ruling on this proper alternative ground. *State v. Bryan,* 709 P.2d 257, 260 (Utah 1985).[24] Finally, as noted regarding exclusion of the firebombing incident, there is no indication that admission of the preliminary hearing testimony would have been reasonably likely to result in a more favorable trial outcome for Harrison.

## III. SEARCH OF DIAPER BAG

Harrison's third claimed error is that the search of the diaper bag, where his gun was found, violated his rights against unreasonable search and seizure, and, therefore, the gun should not have been admitted into evidence. Harrison cites both the fourth amendment to the United States Constitution and the Utah Constitution art. I, § 14, but does not argue that the two provisions should be construed differently.

---

22. In light of Rule 104(a), we reject Harrison's contention that the jury should have been allowed to decide whether Bray's preliminary hearing testimony was inconsistent with his trial testimony.

23. Bray's preliminary hearing testimony appears to contradict his trial testimony mainly in that the former testimony indicates the decision to get guns was a group decision shared by Harrison if not articulated by him. At trial, Bray did not quote Harrison directly, but testified that Harrison had made some statement of intention to get a gun. The claimed inconsist-

ent preliminary hearing statement that Harrison had never said he was *going* to get a gun was sandwiched between statements that Harrison never specifically said, after being dropped off and then picked up again at his residence, that he had in fact picked up his gun.

24. *See also* Utah R.Evid. 611(a) (trial court to reasonably control evidence presentation for purposes of effective truthfinding, avoiding waste of time, and protecting witnesses from harassment).

Our analysis is therefore limited to the fourth amendment.

The trial court found that the diaper bag was under the principal custody and control of Harrison's wife, and that Mrs. Harrison freely and voluntarily consented to the search of the bag. We do not overturn fact findings underlying a decision to suppress or admit evidence unless they are clearly erroneous. *State v. Johnson*, 771 P.2d 326, 327 (Utah Ct.App.1989). Legal conclusions based on those findings, however, are reviewed on a nondeferential, correction of error basis. *Id.*

### Custody and Control.

 Evidence in the suppression hearing showed that Harrison was living apart from his wife and children at the time of the arrest, so there is no clear error in finding that the diaper bag was primarily under Mrs. Harrison's custody and control. However, the trial court did not state the legal conclusion it drew from this finding.

The State invites us to infer that the finding represents a conclusion that Harrison lacked standing to challenge the search. Such a conclusion lacks legal support. In *Minnesota v. Olson*, — U.S. ——, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the United States Supreme Court held that an overnight houseguest had a sufficient privacy interest in the occupied premises to challenge his warrantless arrest therein. The Harrisons testified at the suppression hearing that when they were together with the children, both had access to the diaper bag for child care purposes. As with the homeowner and her guest in *Olson*, 110 S.Ct. at 1689, Mrs. Harrison's ultimate ownership of and control over the diaper bag was not inconsistent with Harrison also having a legitimate privacy expectation in it. Therefore, Harrison had standing to challenge the search.

 The finding that Mrs. Harrison had custody and control of the diaper bag also meant that she had authority to consent to its search, and that separate consent from Harrison was unnecessary. It is quite clear that either party sharing joint use of property can, under the fourth amendment, give valid consent to a search of that property. *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969) (consent to search defendant's duffel bag was binding on defendant when given by co-user of bag). Therefore, Mrs. Harrison's consent, if valid, was sufficient to permit the search.

### Validity of Mrs. Harrison's Consent.

A warrantless search is per se improper under the fourth amendment unless a specific exception applies. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *State v. Arroyo*, 796 P.2d 684, 687 (Utah 1990). The State has the burden of showing that such an exception, in this case valid consent to the search, applies. *Arroyo*, 796 P.2d at 687.

Consent to search the diaper bag was obtained from Mrs. Harrison following her arrest, at the public safety building where she had been taken for questioning.[25] Harrison does not contest the trial court's finding that this consent was freely and voluntarily given. However, this finding, by itself, does not support a conclusion that the consent was valid.

In *Arroyo*, the Utah Supreme Court held that, for a consent to a search to be valid, the consent must be voluntarily given *and* not obtained by exploitation of prior illegal police conduct. 796 P.2d at 688. In essence, as applied here, the second part of this test is necessary to deter police from using illegal means to uncover reasons to seek consent for a search. "Police should not be permitted to ratify their own illegal conduct by merely obtaining a [voluntary] consent after the illegality has occurred." *Id.* at 689.

At the suppression hearing, Mrs. Harrison testified that she consented to the diaper bag search because she had seen a police officer search the bag and find the

---

25. The record does not reveal the crime for which Mrs. Harrison was arrested. Harrison, however, does not contend that his wife's arrest was illegal. Therefore, we presume her arrest was proper.

gun earlier, at the arrest scene. She believed that withholding her consent after the fact would be futile, akin to closing the barn door after the horses have escaped. The detective who sought her consent testified that he did so based on an arresting officer's report that the diaper bag appeared to contain a gun. Therefore both the request for and the grant of Mrs. Harrison's consent to search the bag at the public safety building were prompted by police conduct at the arrest scene. If that conduct was illegal, Mrs. Harrison's consent was probably invalid.

The trial court never entered a specific finding related to the legality of police handling of the diaper bag at the arrest scene.[26] The burden was on the State to justify any search of the diaper bag. Harrison argues that the diaper bag was illegally searched at the arrest scene.[27] The State argues that the arrest scene search of the diaper bag was legal because it was incident to the Harrisons' arrest.

A contemporaneous, warrantless search of the area within an arrestee's immediate control is permissible for the purpose of recovering weapons the arrestee might reach, or to prevent concealment or destruction of evidence of the crime. *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969); *State v. Harris,* 671 P.2d 175, 180 (Utah 1983). Both justifications were present here. Police sought Harrison because they believed that he had been involved in Glover's shoot-

ing. Upon finding and arresting Harrison, it was reasonable for police to believe that he might have a gun within his control, and that the gun might be evidence of a crime.

The area of "immediate control" can extend to a closed container left in the passenger area of a car, even after the arrestee has been moved away from the car. *New York v. Belton,* 453 U.S. 454, 461, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). *See also State v. Houser,* 669 P.2d 437, 440 (Utah 1983) (per curiam) (search of arrestee's backpack permissible); *State v. Kent,* 665 P.2d 1317, 1318 (Utah 1983) (search of passenger area of car permissible where arrestee was handcuffed and lying on ground next to car); *In re K.K.C.,* 636 P.2d 1044, 1046 (Utah 1981) (per curiam) (search of pickup cab and bed, including unlocked container therein, permissible although arrestee removed from truck).

In this case, the Harrisons were ordered to the ground and searched by arresting police. The record indicates that the baby stroller and diaper bag were approximately ten feet away from them at this time. This distance, coupled with the fact that the Harrisons were individually guarded, raises doubt that the diaper bag was in either of the Harrisons' immediate control, in terms of either of them being able to reach into it before officers could intervene.[28] However, the arrestees in *Belton, Houser, Kent,* and *K.K.C., supra,* were similarly removed from the searched areas, and those searches were upheld.[29]

26. We have recently indicated our approval of the practice in many jurisdictions of requiring specific fact findings to support a trial court's decision on a motion to suppress. *See State v. Marshall,* 791 P.2d 880, 882 n. 1 (Utah Ct.App. 1990). Where specific findings are required, failure to enter such findings is reversible error unless the facts in the record "are clear, uncontroverted, and capable of supporting only a finding in favor of the judgment." *Kinkella v. Baugh,* 660 P.2d 233, 236 (Utah 1983). Because the Utah Supreme Court had not issued its *Arroyo* opinion while Harrison's case was before the trial court, it may not have been clear to the trial court that findings on both voluntariness and the legality of prior police conduct were needed for consent to a warrantless search to be valid. We therefore examine the record in this case to see if the facts on record support a

conclusion that police conduct at the arrest scene was legal.

27. As noted earlier, there is dispute over whether the diaper bag was fully searched at the arrest scene or simply "patted down." If a full search of the bag was proper incident to the arrest, this dispute becomes meaningless. Therefore for our analysis we will accept as true Mrs. Harrison's assertion that the bag was fully searched.

28. Additionally, the record reveals that Mr. Harrison was handcuffed and was taken away in a patrol car just before the diaper bag was searched.

29. In *Belton,* the Supreme Court recognized the difficulty of workably defining the area within an arrestee's immediate control. In the context

Here, the diaper bag was sufficiently within the Harrisons' immediate control, as that term has been construed, to permit its search incident to their arrest.

A separate safety concern also justified searching the diaper bag at the arrest scene. Even if the bag were outside any realistic control by the Harrisons, there was no way to secure it at the scene pending the obtaining of a warrant to search it. The bag, stroller, and babies were going to be moved. Additionally, babies being babies, somebody would need to get into the bag before long. If that somebody were Mrs. Harrison, it was reasonable to ensure there was no weapon in the bag that she might obtain or hide. It was also reasonable to protect anyone else who might move or get into the bag for baby care against the possible existence and accidental discharge of a loaded weapon within.

Concerns both for safety and preservation of evidence were present, and under applicable case law the diaper bag was sufficiently within the Harrisons' control to allow its search. We hold, therefore, that the arrest scene search of the diaper bag was permissible under the fourth amendment. Consequently, there was no police illegality tainting the later request for and grant of permission to search the bag at the public safety building, when the gun was confiscated.[30] The denial of Harrison's fourth amendment-based suppression motion was therefore appropriate.

We also believe that, under Harrison's defense theory, admission of the pistol into evidence could not have prejudiced him. Harrison admitted the shooting, claiming self-defense. Admission of the pistol was therefore not the critical or sole factor tying him to the shooting. Therefore, even if the searches leading to police recovery of the pistol were improper, under these circumstances there was no reasonable likelihood of a different trial outcome had the gun been suppressed.[31]

## IV. PROSECUTORIAL MISCONDUCT

Harrison presents a laundry list of instances of alleged prosecutorial misconduct. We consider only those instances to which timely objection was made by Harrison at trial and which, in the exercise of our discretion, warrant addressing in this written opinion. *State v. Carter*, 776 P.2d 886, 888–89 (Utah 1989). The issues of concern here are whether Harrison was prejudiced by the prosecutor's remarks about Harrison's exercise of the marital privilege, and whether the prosecutor violated Harrison's right against self-incrimination.

### Marital Privilege.

Before trial, the State agreed that Harrison's wife would be barred from testifying under the marital privilege statute, Utah Code Ann. § 78–24–8(1) (1987).[32] A

of the search of the passenger area of a car from which the arrestee has been removed, the Court noted that such an area is one into which "generally, even if not inevitably," the arrestee might reach. 453 U.S. at 460, 101 S.Ct. at 2864. Police restraint and physical removal of the arrestee, then, while limiting the arrestee's ability to actually reach into a particular area, does not automatically prohibit police from searching that area.

30. Indeed, it appears that no consent was necessary, because under our analysis the police could have confiscated the gun at the arrest scene.

31. According to the record, Harrison's weapon was a relatively small, .25 caliber pistol. Admission of this type of weapon would not necessarily be inconsistent with Harrison's claim of self-defense. Prejudice would be more likely, of course, if the weapon were, for example, a shot-

gun, assault rifle, or other weapon not generally associated with private citizens seeking to protect themselves while out in public.

32. Section 78–24–8(1) (1987) reads, in pertinent part:

A husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor can either during the marriage or afterwards be, without the consent of the other, examined as to any communication made by one to the other during the marriage....

The current version of the statute appears to limit the scope of the statutory privilege only to marital communications: "Neither a wife nor a husband may either during the marriage or afterwards be, without the consent of the other, examined as to any communication made by one to the other during the marriage." Utah Code Ann. § 78–24–8(1)(a) (Supp.1990). How-

jury instruction incorporating the state constitutional version of the marital privilege was commented upon by the prosecutor in closing argument as follows:

> Instruction No. 10. This is a very interesting one.
>
> A married person may not be forced to testify in any criminal action against their spouse.
>
> What's the assistance of that? Well, there is a preliminary hearing of this matter on the 17th of May and the defendant gets married in July. And the trial is in August. *Isn't it interesting that one of the two people who got told about the gun in [Glover's] waistband is the wife who can't testify?*

(Emphasis added.) The comment ultimately attacked Harrison's trial testimony that Glover had been armed, an assertion he never made, at least to prosecutors or police, until trial. Harrison testified that he had not been completely silent about Glover's alleged gun before trial, claiming that he had told his wife and the wife of one of his companions about this shortly after the shooting. The companion's wife could not be located for trial.

Harrison objected to the prosecutor's comment on his exercise of the marital privilege, but the trial court overruled the objection. On appeal, the State correctly concedes that the prosecutor's comment was improper. *See State v. Brown,* 14 Utah 2d 324, 383 P.2d 930 (1963). The State argues, however, that the comment was harmless error.

*State v. Valdez,* 30 Utah 2d 54, 513 P.2d 422 (1973), sets forth a two part test for assessing whether improper counsel comments in a criminal case are harmless or warrant reversal. Such comments warrant reversal if (1) they call juror attention to matters which should not be considered in reaching a verdict; and (2) under the circumstances of the particular case, the jurors were probably influenced by the comments. 513 P.2d at 426. [33] We equate the second part of this test with our usual standard for reversible error: reversal is required where there is a reasonable likelihood that, absent the error, defendant would have received a more favorable verdict. *State v. Wilson,* 771 P.2d 1077, 1080 (Utah Ct.App.1989).[34]

---

ever, article I, section 12 of the Utah Constitution provides, without limitation, that "a wife shall not be compelled to testify against her husband, nor a husband against his wife...."

**33.** We consider the two part *Valdez* test to effectively supersede *Brown.* In *Brown,* appellant's rape conviction was reversed because of improper prosecutor comments on defendant's marital privilege without consideration of whether those comments were actually prejudicial and, indeed, despite the fact that the evidence in the case supported the conviction. The absence of a prejudice analysis in *Brown* was later criticized. *See State v. Trusty,* 28 Utah 2d 317, 502 P.2d 113, 115 (1972) (Ellett, J., concurring). Part two of the *Valdez* analysis addresses the prejudice issue overlooked in *Brown.*

**34.** We are aware of language in other cases suggesting that where a prosecutor's comment has the effect of destroying a privilege by inviting the jury to draw an adverse inference from its exercise, a conviction should be readily reversed. For example, in *Trusty,* the Utah Supreme Court stated that such a comment warrants a new trial if there is "a *possibility* that it prejudiced the defendant, in the sense that there is *any* likelihood that there *may* have been a different result...." 502 P.2d at 114 (emphasis added). Later in the same opinion, however, the court indicated that it was applying a test of

"whether in surveying the total circumstances it appears that there is *any reasonable likelihood* of *any substantial prejudice* to the defendant...." *Id.* at 115 (emphasis added).

Similarly, in *State v. Eaton,* 569 P.2d 1114 (Utah 1977), addressing a prosecutor's improper comment on the defendant's exercise of the privilege against self-incrimination, our supreme court stated: "[W]e believe that, on appeal, when there is a reasonable doubt as to whether the error below was prejudicial, that doubt should be resolved in favor of the defendant." *Id.* at 1116. The same passage, however, indicated that the threshold for reversal for such a comment would be "a reasonable likelihood that in its absence there may have been a different result...." *Id. Eaton* was later cited to support the latter standard for reversal, in a case where a wife testified for the State over the defendant husband's objection. *See State v. Bundy,* 684 P.2d 58, 61 (Utah 1984). It appears, therefore, that in order to reconcile the slight semantic difference, a determination of a reasonable likelihood of a different result should subsume the notion that any doubts as to prejudice are to be resolved in favor of an accused. *See also Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967) ("little, if any" difference exists between the two standards).

·Part one of the *Valdez* test is satisfied here. The prosecutor's comment invited the jury to infer that Harrison used the marital privilege to hide relevant information. Indeed, it is apparent that the jury was also invited to infer that Harrison married his wife to prevent her from testifying. Neither inference should have been considered by the jury in reaching its verdict.

In applying part two of the *Valdez* test, it is appropriate to compare the likely impact of the improper prosecutor comment with other evidence of Harrison's guilt. *State v. Troy*, 688 P.2d 483, 486 (Utah 1984). We also look at the comment in relation to evidence that might absolve Harrison. Specifically, would the jury have been more likely to acquit Harrison, based on his self-defense claim, if the improper comment had not been made?

The comment attacked, in a roundabout manner, Harrison's testimony that Glover had been armed with a gun. The allegation that Glover was armed was stressed in Harrison's trial defense.[35] In response, the prosecutor impeached Harrison's testimony by eliciting his admission that he had not told police or prosecutors about Glover's gun until trial. The testimony of Terron Horton, the only other witness claiming to have possibly seen Glover's gun, was impeached on the basis of his not having reported it in his initial statement to investigators. No gun was recovered from Glover, and no other witness reported that Glover had a gun at any time on the night of the shooting. The jury thus had ample reason to reject the assertion that Glover had been armed, quite apart from any impact the prosecutor's comment may have had. Accordingly, we see no reasonable likelihood of a more favorable verdict had the comment not been made. The comment was, therefore, harmless error.

*Self-incrimination.*

■ Harrison contends that the following comment in the prosecutor's closing argument was an improper use of his post-arrest silence against him:

> The most incredible story, the added detail of the chrome plated revolver that he saw so well from a distance of fifteen feet sticking out of the waistband of the dead man. Waistband? Waistband? On a dark end street with some back lit things from the Persepolis restaurant? He's so sure he saw that that he's willing to kill a man. No, that's an added detail. He made that up later. He never tells anybody about that.

The trial court overruled Harrison's objection that this was an improper comment on his post-arrest silence, holding that Harrison had waived his right to remain silent by testifying, and that the comment was simply one on the credibility of his testimony. Earlier cross-examination questions relating to Harrison's failure to report Glover's "chrome gun" before trial had also elicited objections.

The challenged questions and argument were, again, part of the prosecutor's efforts to impeach Harrison's claim that Glover had been armed. In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 96 S.Ct. at 2245. In *State v. Wiswell*, 639 P.2d 146 (Utah 1981), the Utah Supreme Court, relying on *Doyle*, reversed a conviction where the prosecutor had repeatedly drawn attention to the fact that defendant had not, following his arrest, told the exculpatory story he testified to at trial. Therefore, it was error for the trial court to hold that Harrison had waived his post-arrest silence right, and the connected right to not have such silence used to impeach him, by testifying at trial.

■ The State argues that *Doyle* does not apply here, because there is no sign

---

35. The allegation was not, however, critical to Harrison's self-defense claim. The jury was instructed that apparent peril, without actual peril, could support a self-defense claim. Thus Harrison's belief that Glover had a gun, if reasonable, could have supported the self-defense theory.

that Harrison ever invoked his right to silence, and because it is unlikely that the challenged closing argument and related cross-examination would be understood by the jury to be comments on post-arrest silence. We agree on both points.

We find no indication in the record that Harrison ever invoked his right to remain silent, nor does Harrison assert on appeal that he ever invoked his right.[36] *See United States v. Agee,* 597 F.2d 350, 355 (3rd Cir.1979), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (*Doyle* not applicable where defendant did not remain silent after arrest). Absent record support, we will not presume that Harrison exercised his right to post-arrest silence. Therefore, he has not met the threshold requirement for an analysis of prosecutorial questions and argument under *Doyle.*

Even if Harrison did invoke his post-arrest silence right, a comment related to silence at trial is improper only if it is " 'manifestly intended or [is] of such character that a jury would naturally and necessarily construe it to amount to a comment on the failure of the accused to testify.' " *State v. Nomeland,* 581 P.2d 1010, 1011 (Utah 1978) (quoting *State v. Jefferson,* 116 R.I. 124, 353 A.2d 190, 198 (1976)); *accord, State v. Tucker,* 709 P.2d 313, 315 (Utah 1985). Applying this analysis to the comment and questions related to Harrison's possible pre-trial silence, we cannot find that they were manifestly improper.

The prosecutor's statement, "He never tells anybody about that," was made while commenting upon Harrison's trial account of the moments surrounding the shooting. In this context, the statement did not "naturally and necessarily" invite the jury to consider anything Harrison may or may not have said the following afternoon, after his arrest. Unlike *Wiswell,* 639 P.2d at 147, jurors were not specifically and repeatedly referred to the defendant's post-arrest silence. They were, however, effectively invited to consider Harrison's significant *pre-arrest* silence, which was entirely permissible. *Jenkins v. Anderson,* 447 U.S. 231, 238–40, 100 S.Ct. 2124, 2129–30, 65 L.Ed.2d 86 (1980).

For one thing, Harrison testified that he did not call the police with his exculpatory story after the shooting.[37] He also claimed that he told only his wife and his friend's wife about "Glover's gun" in the aftermath of the shooting. This unusually quiet behavior, in circumstances where he would be naturally expected to vigorously assert that Glover had been armed, was a proper basis for the impeachment of Harrison's trial testimony. *Jenkins,* 447 U.S. at 239, 100 S.Ct. at 2130.[38]

## V. JURY INSTRUCTION ON REASONABLE DOUBT

Harrison's final contention on appeal is that the trial court erred in failing to give his proffered instruction on reasonable doubt. The instruction actually given was the same one we recently approved in *State v. Pedersen,* 802 P.2d 1328 (Utah Ct.App.1990), notwithstanding that defendant there, like Harrison, proffered an al-

---

**36.** Indeed, in his reply brief, Harrison admits that he "may not have invoked his right to remain silent," and that he "may have spoken to police after he was arrested and prior to trial." He asks this court to find that he remained silent, however, because the "clear implication of the prosecutor's closing argument" was that he did so. We decline to indulge in such speculative fact finding on Harrison's behalf, because it is properly Harrison's burden to bring forward some factual underpinning for his appeal. We also note that an equally clear implication of the prosecutor's argument would be that Harrison did not remain silent, so that the prosecutor felt free to comment upon Harrison's failure to report "Glover's gun" before trial.

**37.** On direct examination, Harrison explained that he did not call police with his story because he was afraid, or because of his wife's fears. It was proper for the prosecutor to challenge this testimony on cross-examination, Utah R.Evid. 611(b), and in closing argument.

**38.** Harrison's and other testimony was that he and his companions stayed together for quite some time, possibly until daybreak, following the shooting and before the arrest. Glover's gun, if it existed, should have engendered considerable discussion in the aftermath of the shooting. Harrison testified, however, that he and his male companions did not talk about the shooting at all during this time.

ternative instruction. Our analysis in *Pedersen* applies here without repetition.

Additionally, jury instructions are to be construed as a whole. *State v. Johnson,* 774 P.2d 1141, 1146 (Utah 1989). Here, jurors were fully and correctly instructed on the elements of second degree murder and manslaughter. They were informed of the State's duty to prove each element of each crime beyond a reasonable doubt, including intent and the absence of a self-defense justification. Therefore, the challenged instruction, besides being adequate in its own right, was proper in the context of the other jury instructions.

## CONCLUSION

The conviction is affirmed.

BENCH and BILLINGS, JJ., concur.