Johnny **RODRIGUEZ**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. A14–90–00253–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 14, 1991.

Paul Licata, Houston, for appellant.

Carol M. Cameron, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and MURPHY and CANNON, JJ.

## OPINION

CANNON, Justice.

Appellant entered a plea of not guilty before a jury to the offense of delivery of a controlled substance, namely cocaine. TEX. REV.CIV.STAT.ANN. art. 4476–15, § 4.03(a) (Vernon Supp.1988), *repealed by* Acts 1989, 71st Leg. ch. 678, § 13 (effective September 1, 1989). He was convicted and the court assessed punishment at imprisonment for twenty-five years, plus a $10,-000.00 fine. Appellant brings three points of error. We affirm.

On the morning of May 25, 1989, a confidential informant contacted Detective Albert Ray Diaz in the Narcotics Division of the Harris County Sheriff's Department. The informant told Diaz about some prospective sellers of cocaine. The informant arranged a meeting with the prospective sellers at the Dairy Queen parking lot on Airline Drive in Houston. Diaz and Detective John Schulte went in Schulte's truck to the Dairy Queen to meet with the informant and the prospective sellers. Schulte had $140,000.00 in "impression money," so he parked his truck in the parking lot across from where the informant introduced Diaz to Jairo Manual Vivanco. Nine or ten other officers were conducting surveillance in unmarked cars. Diaz told Vivanco that he was interested in purchasing eight kilos of cocaine. Vivanco stated that he could get whatever Diaz wanted and he quoted Diaz a price of $17,000.00 per kilo.

Vivanco asked to examine the money before calling his connection. Diaz escorted Vivanco to Schulte's truck where Schulte displayed the money. Vivanco told Diaz that he would meet him later after talking with his connection. Vivanco stated that his connection would also need to see the money. Diaz gave Vivanco his beeper number. Surveillance officers observed Vivanco leave the scene and walk to an apartment complex on Airline, some two to three blocks from the Dairy Queen. They saw Vivanco enter an apartment in that complex.

About 1:00 p.m., Vivanco paged Diaz. Diaz returned the call, at which time Vivanco told him that his connection was coming to the apartment and that they would meet Diaz at the Dairy Queen at 1:30 p.m. About that time, Diaz and Schulte arrived in Schulte's truck, which Schulte parked at the Jack–In–The–Box next to the Dairy Queen. Appellant, Vivanco, and Jimmy Rodriguez were waiting in a blue Cutlass parked at the Dairy Queen. Schulte remained in the truck while Diaz went to speak with Vivanco. Vivanco introduced Rodriguez as the person with the connection. Diaz took Rodriguez to the truck and Schulte showed Rodriguez the money. Rodriguez stated that he was going to immediately call his connection.

At that point, Diaz observed Rodriguez appear to use a nearby pay-telephone. After Rodriguez hung up the telephone, appellant and Vivanco drove over to the telephone. Appellant and Vivanco exited the car and had a discussion with Rodriguez.

Rodriguez eventually told Diaz that his connection would not be able to bring the cocaine until 5:00 p.m. When Diaz questioned the wait, appellant told him that "this was a delicate situation and that it shouldn't be rushed." Diaz told Rodriguez to beep him when the cocaine arrived in the area.

Appellant, Vivanco, and Rodriguez left the area in the Cutlass. Surveillance officers observed them return to the same apartment where Vivanco had entered earlier that day. A short time later, surveillance officers observed Garces Arnel Estrada and Overt Alegria, arrive in a red Subaru and enter the same apartment that appellant, Vivanco, and Rodriguez had entered.

Sometime after 5:00 p.m., Vivanco paged Diaz and Diaz returned the call. Vivanco told Diaz to proceed to the area of Airline and West Road where he would page Diaz when the cocaine was received at his apartment. At approximately 5:30 p.m., Vivanco paged Diaz and Diaz returned the call, at which time Vivanco told Diaz that the cocaine had arrived and to meet him at the Dairy Queen. At 6:00 p.m., surveillance officers observed appellant, Vivanco, Rodriguez, Estrada, and Alegria exit the apartment and spend twenty minutes loading clothes into the Subaru and the Cutlass. Appellant, Vivanco, and Rodriguez left in the Cutlass and Estrada and Alegria left in the Subaru. Before leaving the apartment complex, Alegria retrieved a gray duffel bag from a dumpster and placed it in the Subaru.

Diaz and Schulte arrived at the Dairy Queen to find appellant, Vivanco, and Rodriguez waiting in the blue Cutlass. Schulte parked his truck across the parking lot from the Cutlass and Diaz got out to ask Vivanco about where the transfer would take place. Vivanco told Diaz that his people were looking for a location. Vivanco then asked Diaz if he brought the money. When Diaz answered affirmatively, Vivanco insisted on seeing it again. Diaz obliged him. Vivanco asked Diaz if Diaz and Schulte would follow the Cutlass to the location of the transfer. Vivanco also

asked Diaz if he could ride in the truck but Diaz refused after noticing that Vivanco was armed. Schulte and Diaz followed the Cutlass to the parking lot of an apartment complex located at Denmar and Imperial Valley in Harris County. Shortly after the Cutlass arrived, surveillance officers also observed the red Subaru in the area. They observed Alegria exit the Subaru and walk in and around the complex. After fifteen minutes, the Subaru came by and picked up Alegria and then proceeded back to the apartment complex on Airline.

Schulte dropped Diaz off near the parked Cutlass and parked the truck some twenty yards away. Diaz asked Vivanco about the drugs and Vivanco directed him to the back seat where appellant was sitting. Diaz remained outside the car as appellant picked up and displayed what appeared to be "several block-like objects wrapped in gray duct tape." Based upon his experience and observation of the wrapping, Diaz opined that the cocaine had been diluted. When Diaz asked to cut into the packages to check their contents, Vivanco responded that that was unnecessary and pulled from his pants pocket a clear zip-lock bag containing approximately three to four grams of cocaine. When Diaz again insisted on inspecting the quality of the cocaine in the packages, Vivanco told Diaz that he would call him later and ordered Rodriguez to drive away. Surveillance officers observed the Cutlass proceed to the apartment complex on Airline.

Around 10:00 p.m., Vivanco paged Diaz and Diaz returned the call once again. Vivanco asked Diaz whether he still wanted to make the deal. Diaz expressed his concern that Vivanco was trying to rob him. Vivanco assured him otherwise, explaining that he did not like the area where they met earlier. Vivanco agreed to page Diaz at 11:00 a.m. the next morning to set up another meeting. Vivanco did so and Diaz returned the call. Vivanco stated that he was ready to complete the transaction and wanted to meet Diaz at the Dairy Queen. Diaz demanded not only that they meet at a nearby Safeway parking lot but that he also be able to cut into the packages.

On the morning of May 26, 1989, surveillance officers observed appellant, Vivanco, Rodriguez, Estrada, and Alegria exit the apartment on Airline. Appellant was carrying a gray duffel bag similar to the bag seen the day before. Appellant, Vivanco, and Rodriguez drove off in the Cutlass and Estrada and Alegria drove off in the Subaru. At approximately 11:30 a.m., Diaz parked his black LeBaron directly in front of the Safeway store. Schulte parked his truck twenty-five yards away. The Cutlass pulled up next to Diaz's car. Estrada parked the Subaru in a strip shopping center a couple hundred yards away from the Safeway. Estrada and Alegria exited the Subaru, opened the trunk, and changed shirts. They got back in the Subaru and drove to the Safeway parking lot and parked five aisles away from Diaz's car. Estrada and Alegria exited the Subaru. Estrada walked toward Schulte's truck and Alegria walked toward the Safeway store. Schulte moved his truck as Estrada approached.

Diaz approached the passenger side of the Cutlass. Rodriguez was standing outside the car on the driver's side and Vivanco and appellant were sitting in the car on the passenger side. Diaz asked Vivanco if he had the merchandise. Vivanco stated that Rodriguez wanted to see the money first. Diaz insisted on inspecting the merchandise. Appellant then gave the gray duffel bag to Vivanco, who pulled out three packages. Diaz noticed that the packages appeared different from the packages displayed the previous day. Vivanco gave a package to Diaz, who unsuccessfully tried to cut into it. Diaz gave the package back to Vivanco, who cut it open along with the two other packages. Diaz tested the samples. Satisfied that it was cocaine, Diaz told Vivanco that he was going to Schulte's truck to get the money. As he walked toward the truck, Diaz gave the bust signal. He and Schulte then drove away in the truck.

In his first point of error, appellant attacks the sufficiency of the evidence to support his conviction.

In reviewing the sufficiency of the evidence, the test is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler v. State,* 769 S.W.2d 234, 239 (Tex.Crim.App.1989). The standard of review is the same for both direct and circumstantial evidence. *Carlsen v. State,* 654 S.W.2d 444, 449 (Tex.Crim.App 1983) (opin. on reh'g).

In applying that standard of review to circumstantial evidence cases, "the exclusion of reasonable hypothesis' test" is used. *Ransom v. State,* 789 S.W.2d 572, 577 (Tex.Crim.App.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990) (citing *Garrett v. State,* 682 S.W.2d 301, 304 (Tex.Crim.App.1984), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985)). That is, a conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every reasonable hypothesis except the guilt of the accused. *Humason v. State,* 728 S.W.2d 363, 366 (Tex.Crim.App.1987). It is not necessary, however, that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Russell v. State,* 665 S.W.2d 771, 776 (Tex.Crim.App.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984). While the presence of an accused at the scene of an offense is not alone sufficient to support a conviction, it is a circumstance tending to prove guilt, which, combined with other facts, may suffice to show that the accused was a participant. *Beardsley v. State,* 738 S.W.2d 681, 685 (Tex.Crim.App.1987).

Appellant argues that there is no evidence that he offered to sell the cocaine. He notes that all the conversations were between Vivanco and police officers and that he was not privy to those conversations. Appellant asserts that there is no evidence that he took part in preparing the

packages or that he had knowledge of their contents. Appellant contends that his only part in the entire transaction was handing a package to Vivanco during the second meeting with police officers. Appellant says there is no evidence that he had knowledge of what was contained in the package.

The indictment alleged that appellant "on or about May 26, 1989, did then and there unlawfully intentionally and knowingly deliver by offering to sell to A.R. DIAZ, a controlled substance, namely, COCAINE, weighing by aggregate weight, including any adulterants and dilutants, at least 400 grams." The jury was charged on the law of parties, which provides that "a person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense." TEX.PENAL CODE ANN. § 7.02(a)(2) (Vernon 1974).

■ Evidence is sufficient under the law of parties where the actor is physically present at the commission of the offense, and encourages the commission of the offense by either word or by agreement. *Burdine v. State,* 719 S.W.2d 309, 315 (Tex.Crim.App.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). The evidence must show that at the time of the offense the parties were acting together, each contributing some part toward the execution of the common purpose. *Id.* In determining whether a defendant participated in an offense as a party, the court may examine the events occurring before, during, and after the commission of the offense, and may rely on the actions of the defendant which show an understanding

and common design to commit the offense. *Id.*

■ While "an offer to sell" is included in the definition of "deliver" or "delivery," proof of an offer to sell must be corroborated by a person other than the offeree or by evidence other than a statement of the offeree. TEX.REV.CIV.STAT.ANN. art. 4476–15, § 1.02(7) (Vernon Supp.1988), *repealed by* Acts 1989, 71st Leg. ch. 678, § 13 (effective September 1, 1989). Such corroboration is clearly demonstrated by the events and circumstances of the transaction as testified to by Schulte and surveillance officers. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that appellant, as a party, committed the offense. We overrule appellant's first point of error.

In his second point of error, appellant contends the trial court erred in refusing to grant his *Batson* motion or to hold a hearing on the State's use of its peremptory challenges to strike Hispanic-surnamed jury panel members.

■ Initially, we address the State's contention that appellant waived his *Batson* objection. The Court of Criminal Appeals has held that "a defendant may make a timely objection within the Batson lines, if such objection is made after the composition of the jury is made known but *before* the jury is sworn and the venire panel is discharged." *Henry v. State,* 729 S.W.2d 732, 737 (Tex.Crim.App.1987) (emphasis in the original). In the instant case, appellant's counsel made his Batson motion before the jury was sworn but after the venire panel was discharged. We hold that appellant's motion was untimely and that appellant failed to preserve error. *Brown v. State,* 769 S.W.2d 565, 567 (Tex.Crim. App.1989).[1]

---

1. In *Hill v. State,* 787 S.W.2d 74 (Tex.App.— Dallas 1990, pet. granted) (opin. on reh'g), the Court found that the subsequent enactment of article 35.261 of the Code of Criminal Procedure supersedes *Henry. Hill,* 787 S.W.2d at 76. Article 35.261 provides in pertinent part:
 (a) After the parties have delivered their list to the clerk ... and before the court has impanelled the jury, the defendant may request the court to dismiss the array and call a new array in the case ...

(b) If the court determines that the attorney representing the state challenged prospective jurors on the basis of race, the court shall call a new array in the case.
Id. (citing TEX.CODE CRIM.PROC.ANN. art. 35.261 (Vernon 1989)).
 According to *Hill,* the *Henry* rule that a timely objection must be made "before the jury is

■ Assuming appellant had preserved error, the State contends and the trial court found that appellant failed to establish a prima facie case of discrimination. The court ruled as follows:

However, in all five cases, it was not done in a procedural way. The proof has not been made. No one has put any proof as to whether or not their defendant is, in fact, an identifiable minority, nor have they shown in any fashion that the State has used its peremptory strikes in a way which is not explained in a racially neutral way.

With that, I'm going to deny the *Batson* motion, which was originally made by Mr. Correa, and joined in by each of the defense lawyers.

■ The burden of establishing a prima facie case of purposeful racial discrimination is on the defendant. *See Tennard v. State*, 802 S.W.2d 678, 680 (Tex.Crim.App. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991). To establish a prima facie case, a defendant is required to show: that he is a member of a cognizable racial group; that the prosecutor exercised peremptory challenges to remove from the venire members of the defendant's race; and, that these facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude the venirepersons from the jury on account of their race. *Tennard,* 802 S.W.2d at 680; *Thompkins v. State,* 774 S.W.2d 195, 200 (Tex.Crim. App.1987), *aff'd by an equally divided Court,* 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989). A prima facie case represents the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true. *Thompkins,* 774 S.W.2d at 201.

■ At a Batson hearing, the trial judge, as factfinder, has the obligation to weigh the evidence and assess the credibility of witnesses. *Thompkins,* 774 S.W.2d at 202. As a reviewing court, we may not substitute our judgment of the witnesses' credibility and evidentiary weight for those of the factfinder. *Id.* The trial court's findings regarding whether a prima facie showing has been made are entitled to "great deference" and will not be disturbed on appeal unless clearly erroneous. *Whitsey v. State,* 796 S.W.2d 707, 726 (Tex. Crim.App.1989) (opin. on reh'g).

Although the record reflects that appellant is Hispanic, there is no evidence to suggest that the prosecutor struck members of appellant's ethnic background. The record reflects that appellant's counsel complained that the State improperly peremptorily challenged six members of the venire, all of whom had Spanish surnames. Appellant asserts that these individuals were the only venirepersons with Spanish surnames. The State's jury list shows otherwise, but even if this were true, that alone does not establish that they were Hispanic. In fact, there is nothing in the record to show how many venirepersons were Hispanic or how many of those persons were struck by the State. Moreover, the record shows that the State did not strike three of the venirepersons about which appellant complains. The trial court's finding was not clearly erroneous. Finding that appellant failed to preserve error and, that if error had been preserved, appellant failed to prove a prima facie case, we overrule appellant's second point of error.

■ In his third point of error, appellant contends that the trial court erred in refusing to charge the jury on a lesser-included offense. Specifically, appellant

sworn and the venire panel is discharged" has been replaced by the article 35.261(a) requirement that an objection, to be timely, must be made before the court has impaneled the jury. *Hill* explained that impanellment by the court is not complete until those who are chosen to serve have been both selected and sworn. It further pointed out, that the part of the *Henry* rule that requires a *Batson* challenge before the dismissal of the venire has been eliminated by article 35.261, which requires that a new venire must be called in all instances where the *Batson* challenge is sustained. *Hill,* 787 S.W.2d at 76. We note that petition for discretionary review has been granted in the *Hill* case. Until the Court of Criminal Appeals says otherwise, *Henry* and *Brown* are still the law.

contends that the court should have instructed the jury on the offense of delivery of a controlled substance weighing less than 28 grams because the actual amount of cocaine seized was less than 28 grams.

In determining whether a charge on a lesser included offense is required, a two-step analysis is used. First, the lesser-included offense must be within the proof necessary to establish the offense charged. Second, there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser-included offense. *Royster v. State*, 622 S.W.2d 442, 446 (Tex.Crim.App.1981) (opin. on reh'g). Delivery of a controlled substance weighing less than 28 grams is within the proof necessary to establish delivery of a controlled substance weighing at least 400 grams. However, there is no evidence in the record that appellant was guilty only of the lesser-included offense.

Appellant was charged with delivery, *by offering to sell*, not by actual or constructive transfer. When the prosecution involves delivery by "offer to sell" that element can be met by the representation, by word or deed, that the person has a controlled substance to sell. *Stewart v. State*, 718 S.W.2d 286, 289 (Tex.Crim.App 1986). The chemical properties or indeed, the presence or possession of any substance is not necessary to the offense. *Id.* It is evident by their words and deeds that appellant and his co-defendants offered to sell eight kilos of cocaine to Diaz. The charge to the jury was proper. Accordingly, we overrule appellant's third point of error and affirm the judgment of the trial court.