**STATE of Utah, Plaintiff and Appellee,**

v.

**Fred A. ALVAREZ, Defendant and Appellant.**

**No. 910019.**

Supreme Court of Utah.

March 31, 1994.

R. Paul Van Dam, Atty. Gen., Kenneth A. Bronston, Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

G. Fred Metos, Salt Lake City, for defendant and appellant.

HOWE, Justice:

Defendant Fred A. Alvarez was convicted of first degree murder as that offense is defined in section 76–5–202(1)(b) of the Utah Code (intentionally or knowingly causing the death of another when "[t]he homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons are killed"). The court sentenced him to life in prison and imposed a twenty-year minimum mandatory term pursuant to section 76–3–203.1 of the Utah Code. Defendant appeals.

On June 8, 1990, defendant and several juveniles and young adults were at the home of Kim and Richard Gabaldon. The group was "partying" and drinking beer and tequila. Guests arrived throughout the evening, and by 11 p.m., the party consisted of fifteen to twenty individuals. Between 8 p.m. and midnight, Richard Gabaldon and defendant together had consumed fifteen cans of beer and more than nine shots of straight tequila.

Around midnight, Don Newingham and his son, Shayne Newingham, arrived at the house with Paul Velasquez, Kenny Salas, and Robert Rivas. All five had been drinking, and the Newinghams and Salas had ingested cocaine. While their companions waited in the car, Don Newingham and Salas got out and walked toward the house. Defendant and Gabaldon, having seen the car arrive, met them before they reached the front door. Salas asked if his group could join the party, but Gabaldon refused because he did not know Don. When Don became angry and refused to leave, defendant pulled a large-bladed knife from his waistband and ordered Don to "just get out of here."

Don was still reluctant to leave the premises, but Salas took him by the arm and pulled him back to the car. Gabaldon and defendant followed them. The party guests had been watching the confrontation from inside the house, but as Gabaldon and defendant walked toward the street, fifteen to twenty of the guests came outside. As defendant approached the car, he recognized the driver, Velasquez, as one of his friends and jogged to the front of the car to talk to him. He told Velasquez that he was welcome to return to the party after he took the Newinghams, Salas, and Rivas home.

As Don was getting into the car, he muttered, "I'm not going to let no young punk pull no knife on me, because I'm going to stick him first." In response, Gabaldon hit

Don in the face with his fist. Don wrestled Gabaldon to the ground and began to beat him with his fists. Defendant saw this altercation, ran around the car, jumped on Don's back, and stabbed him four times with a knife. Don threw him off, causing him to fall backward and stab himself in the leg. As Don lay face up in the street, Gabaldon stomped on his head, leaving the imprint of a tennis shoe on Don's forehead. Others joined in. Salas threw himself on top of Don to shield him from the blows.

When his father was attacked, Shayne Newingham bolted from the car yelling words to the effect, "Don't mess with my dad." He was confronted by Gabaldon, Manuel Alvarez, Manuel Martinez, Tony DeHerrera, and Fred Negrete, and he began fighting with all of them. The testimony concerning who stabbed Shayne is contradictory. Velasquez testified that he saw defendant run around the car and stab Shayne in the same way he had stabbed Don. However, both Gabaldon and Anthony Valerio testified that they observed DeHerrera repeatedly stab Shayne. In any event, within ten seconds Shayne fell to the ground, whereupon Gabaldon, DeHerrera, and Manuel Alvarez kicked him and stomped on his head. Salas attempted to shield Shayne from these assaults. The entire fight lasted about five minutes.

At some point during the melee, two women helped defendant into the house, where they attempted to stop his bleeding wound. With both Newinghams down, Gabaldon returned to the house saying, "[G]et those f__in' white boys out of here." DeHerrera went in the house carrying two bloody knives and instructed Shana Pina to hide them. Pina put one of the knives in the washer under some damp clothing, where detectives found it the next morning. Salas remained with the Newinghams outside while Velasquez and Rivas drove to a nearby store to call an ambulance. Accompanied by Manuel Alvarez and DeHerrera, Gabaldon drove defendant to LDS hospital for treatment.

A short time later, Don and Shayne Newingham arrived by ambulance at LDS hospital, where both died of multiple stab wounds. Shayne had sustained four stab wounds—one near the armpit, another on the right side of the abdomen, and two in the back. The depth of these wounds ranged from eleven to fifteen centimeters, and one indicated that the knife had been partially withdrawn and then reinserted. Don had suffered three stab wounds of similar depth on his back. Again, one wound indicated near complete withdrawal and reinsertion of the knife. The medical examiner concluded that the wounds suffered by both men could have been inflicted with the knife police officers found in the washer at the Gabaldon residence.

Defendant was charged with two counts of first degree murder, as that offense is defined in section 76-5-202(1)(b). At trial, defendant maintained that when the fight began he ran toward the back of Velasquez's car where he saw the glare of a knife coming at him. He lifted his leg to protect himself and was stabbed. He then reached for his knife and "just started swinging it trying to keep whoever had [stabbed] me away from me." He admitted that it was "possible" that he stabbed someone but denied intent to kill anyone.

A death-qualified jury convicted defendant on count I (intentionally and knowingly causing the death of Don Newingham) but acquitted on count II (intentionally and knowingly causing the death of Shayne Newingham). Defendant waived a jury in the penalty phase. The court sentenced him to life imprisonment. It further imposed a twenty-year minimum mandatory sentence under section 76-3-203.1 of the Utah Code, finding:

[T]he offense was committed in concert with two or more persons, including but not limited to the criminal participation in the assaults causing the deaths of Donald and Shayne Newingham by Richard Gabaldon, Manuel Martinez, Manuel Alvarez, Tony DeHerrera and others unknown, each of which would be criminally liable as parties to the offense.

Defendant makes five assignments of error on appeal. He contends that (1) death qualification of the jury violated article I, sections 7, 9, 10, and 12 of the Utah Constitution; (2) the prosecution systematically excluded by peremptory challenge Hispanic jurors from the venire in violation of the Equal Protec-

tion Clause of the Fourteenth Amendment; (3) the evidence was insufficient to establish that the two homicides were committed "incident to a single act, scheme, course of conduct, or criminal episode" as required by section 76–5–202(1)(b) of the Utah Code; (4) the trial court erroneously instructed the jury to disregard an element of the offense of first degree murder; and (5) the trial court erred in imposing the twenty-year minimum mandatory sentence pursuant to section 76–3–203.1. We shall discuss each assignment of error in turn.

## DEATH QUALIFYING THE JURY

■ The Utah practice of death qualification excludes from the venire two classes of jurors: (1) those who entertain "such conscientious opinions about the death penalty as would preclude [them] from voting to impose the death penalty following conviction regardless of the facts," Utah R.Crim.P. 18(e)(10), and (2) those jurors "who would always vote to impose the death penalty upon a finding of first degree murder." *State v. Young*, 853 P.2d 327, 342 (Utah 1993) (plurality opinion) (citing *State v. Schreuder*, 726 P.2d 1215, 1225–26 (Utah 1986)). Defendant argues that this practice "creates a conviction-prone jury that is underrepresentative of the community" and therefore violates his state constitutional rights to an impartial jury and to due process. Utah Const. art. I, §§ 7, 12.[1]

Defendant concedes that the United States Supreme Court has rejected this argument under the United States Constitution. *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (holding death qualification of jury prior to guilt phase of bifurcated capital trial did not violate defendant's

Sixth Amendment right to "impartial jury" representative of "fair cross-section of the community"). However, he contends that a "state constitutional analysis warrants a different result." We disagree.

After defendant filed his brief, we rendered our decision in *Young*. Like Alvarez, the defendant in *Young* made a two-pronged "impartial jury" argument under article I, section 12. First, he contended that a death-qualified jury is "more likely to convict a person accused of a crime" and is therefore unconstitutionally partial. *Young*, 853 P.2d at 342. Second, he argued that his right to an "impartial jury" included the right to "a jury panel made up of a fair cross-section of the community." *Id.* In his view, a death-qualified jury violated the "fair cross-section" guarantee because it did not "represent the community at large." *Id.*

A majority rejected these state constitutional challenges to death qualification. In the lead opinion, Chief Justice Hall wrote, "[W]e cannot conclude that a jury of persons who may impose a death sentence, but are not committed in advance to do so, will be less than fair and impartial in determining guilt." *Id.* at 342 n. 37 (joined by Howe, Assoc. C.J.) (citing *State v. Moore*, 697 P.2d 233, 237 (Utah 1985)). He further explained:

The Utah practice of death qualification excludes not only those jurors who would never vote to impose the death penalty, but also those jurors who would always vote to impose the death penalty upon a finding of first degree murder. This practice comports with Utah law, which permits exclusion of all jurors who cannot follow their oath and apply the law as instructed by the court. The death qualifi-

---

1. In a pretrial motion, defendant argued that death qualification denied him "the right to a fair trial, in violation of Article I, section 12 of the Utah Constitution and Article I, section 7 of the Utah Constitution." He reasoned that the practice created "juries which are under-representative of the community at large, conviction prone, and are more likely to impose the death penalty." The trial court denied the motion.

On appeal, defendant expands this argument, contending that "Article I, sections 7, 9, 10, and 12 of the Utah Constitution do not support the current practice of using the same death quali-

fied jury to decide both the guilt and penalty phases of a capital trial." Because he failed to raise the argument in the trial court that death qualification violated sections 9 and 10 of article I, he "cannot assert it as a basis of error on appeal." *State v. Anderson*, 789 P.2d 27, 29 (Utah 1990). However, defendant's arguments under sections 7 and 12 of article I were "distinctly and specifically" stated below and were therefore properly preserved for appellate review. *State v. Johnson*, 774 P.2d 1141, 1144 (Utah 1989).

cation process is therefore consonant with Utah law. . . .

Death qualification of the jury venire advances a significant state interest in seating jurors willing to abide by the law and follow their oath as jurors.

*Id.* at 342. As under the Sixth Amendment, an impartial jury under article I, section 12 "consists of . . . 'jurors who will conscientiously apply the law and find the facts.' " *State v. Valdez,* 748 P.2d 1050, 1057 (Utah 1987) (citing *Lockhart,* 476 U.S. at 178, 106 S.Ct. at 1767). Death qualifying the jury does not offend this constitutional guarantee.

In footnote 38 of *Young,* the lead opinion dismissed the defendant's fair-cross-section argument. By addressing it, a plurality impliedly recognized that like its Sixth Amendment counterpart, the right to an impartial jury under article I, section 12 includes a fair-cross-section component. However, the plurality concluded that death qualification did not encroach upon the rights which that fair-cross-section component guarantees to criminal defendants:

In noting that death qualification advances a significant state interest, we do not intend to imply in any way that persons excluded due to their convictions on the death penalty constitute a distinctive cross-section of the community under the Utah Constitution or that defendant is entitled to have his individual jury panel mirror the community's general beliefs concerning the death penalty. We adhere to our prior holdings regarding the nature of the fair cross-section requirements. *See, e.g., State v. Bishop,* 753 P.2d 439, 457 (Utah 1988); *State v. Tillman,* 750 P.2d 546, 575 (Utah 1987).

*Young,* 853 P.2d at 342 n. 38 (joined by Howe, Assoc. C.J.). We agree with the United States Supreme Court that groups "defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors . . . are not 'distinctive groups' for fair-cross-section purposes." *Lockhart,* 476 U.S. at 174, 106 S.Ct. at 1765.

Thus, contrary to defendant's position, a jury panel that is death qualified remains a fair and representative cross-section of the community.

Having concluded that Alvarez's jury was impartial under article I, section 12, we cannot find that he was deprived of the fundamental fairness guaranteed by the due process clause of the Utah Constitution. Utah Const. art. I, § 7.

## PEREMPTORY CHALLENGES BASED ON RACE

■ In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that equal protection "forbids the prosecutor to challenge potential jurors solely on account of their race." [2] *Id.* at 89, 106 S.Ct. at 1719; *see* U.S. Const. amend. XIV. To successfully attack a peremptory challenge, a defendant must "establish a prima facie case of purposeful discrimination in selection of the petit jury." 476 U.S. at 96, 106 S.Ct. at 1723. The purpose of the prima facie case requirement is to "separate meritless claims of discrimination from those that may have merit." *United States v. Malindez,* 962 F.2d 332, 334 (4th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 215, 121 L.Ed.2d 154 (1992).

■ To establish a prima facie case, a defendant must demonstrate facts and circumstances that raise the "necessary inference of purposeful discrimination." *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723. The *Batson* Court "gave only sparing, 'illustrative' guidance" as to what circumstances give rise to such an inference. *State v. Harrison,* 805 P.2d 769, 777 (Utah Ct.App.1991) (citing *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723). These included a " 'pattern' of strikes" against minority jurors and discriminatory questions or statements by the prosecutor "during voir dire examination and in exercising his challenges." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. However, in determining whether a prima facie showing has been made, trial courts are to examine all relevant

---

**2.** The United States Supreme Court has since ruled that equal protection also forbids criminal defendants from exercising racially discriminato-ry peremptory challenges. *Georgia v. McCollum,* — U.S. ——, ——, 112 S.Ct. 2348, 2357, 120 L.Ed.2d 33 (1992).

circumstances. *Id.* In *State v. Cantu*, 778 P.2d 517 (Utah 1989), we delineated in greater detail the elements necessary to establish a prima facie case of purposeful discrimination:

> The elements necessary to such a prima facie case include (1) as complete a record as possible, (2) a showing that persons excluded belong to a cognizable group ... and (3) a showing that there exists "a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias."

*Id.* at 518 (citing *People v. Wheeler*, 22 Cal.3d 258, 280, 583 P.2d 748, 764, 148 Cal.Rptr. 890, 905 (1978)). The trial court's conclusion as to whether a prima facie showing has or has not been made is accorded deference on appeal and will not be reversed absent an abuse of discretion.[3] Abuse of discretion means that the trial court's ruling is "beyond the limits of reasonability." *State v. Hamilton*, 827 P.2d 232, 239–40 (Utah 1992).

The venire in defendant's case consisted of seventy-seven persons, five of whom were possibly Hispanic. Four of these five potential jurors had Hispanic surnames—Robert Galvez, Wendy Mayeda, Annie Sanchez, and Madolyn Ramos. The fifth, Joan Anderson, appeared to defense counsel to be Hispanic. The court excused Ramos for cause. The prosecution then used its first and fifth peremptory challenges to strike Sanchez and Mayeda. Defendant followed, using his eighth peremptory to strike Anderson. Galvez remained and served on the petit jury. Prior to the swearing of the jury, defense counsel objected to the prosecution's use of peremptory challenges to strike Mayeda and Sanchez. To establish a prima facie case of purposeful discrimination, counsel argued (1) that the prosecutor used peremptory challenges to strike two of three Hispanic persons on the venire; and (2) that defendant is Hispanic.

At the prosecutor's request, the court determined that defendant had failed to establish a prima facie case of purposeful discrimination.[4] Considering the limited grounds upon which defendant relied to establish a prima facie case and the requirement that he demonstrate a "strong likelihood" of purposeful discrimination based on race or ethnicity, *Cantu*, 778 P.2d at 518, this ruling was not "beyond the limits of reasonability" and must therefore be upheld.[5]

---

3. The abuse of discretion standard of review is particularly appropriate to this question. As explained above, the United States Supreme Court was reluctant to define in detail what facts will raise an inference of discrimination. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723. Likewise, we have not articulated specific factors that amount to a "strong likelihood" that minority jurors were challenged because of their racial or ethnic group membership. By according discretion to the trial court in this area, we permit "experience to accumulate at the lowest court level" until we "see more clearly what factors are important to [the] decision and how to take them into account." Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L.Rev. 635, 662–63 (1971).

4. The record reads as follows:

> MR. MORGAN: We're mumbling through the first part. Where have I systematically excluded? .... Your Honor, make a finding that that's systematic exclusion or not.
> THE COURT: I don't think it is.... I think you've got a decent cross-section of the community in that representation and I frankly don't think that taking off those two, if they are Hispanic, would constitute a discrete minority pattern here.

5. In disposing of defendant's argument, we focus on his failure to establish a "strong likelihood" of purposeful discrimination rather than the requirements that he (1) establish "as complete a record as possible" and (2) show that the stricken jurors belong to a cognizable racial or ethnic group. *State v. Cantu*, 778 P.2d 517, 518 (Utah 1989). In doing so, we do not intend to diminish the importance of these two elements of the prima facie case. The numerical evidence examined in the "strong likelihood" analysis will not be accurate unless defense counsel establishes with certainty that the potential jurors challenged by the prosecution are in fact members of a cognizable racial or ethnic group. Misidentifying or failing to identify the race or ethnicity of a potential juror skews both the percentage of minority jurors excluded by peremptory challenge and the percentage of peremptory challenges used against members of a racial or ethnic group.

> We agree with the conclusion of the Tenth Circuit Court of Appeals:
> > [W]hen analyzing the use of peremptory challenges, it becomes both more realistic and important to identify precisely the race of venire members because the numbers involved are much smaller.... The statistical significance

We note at the outset that as a general rule, a "defendant who requests a prima facie finding of purposeful discrimination is obligated to develop [some] record beyond numbers, in support of the asserted violation." *United States v. Brown*, 941 F.2d 656, 659 (8th Cir.1991). While a "single challenge based on race is impermissible ... 'it is not unconstitutional, without more, to strike one or more [Hispanics] from the jury.'" *Cantu*, 750 P.2d at 597 (citation omitted) (quoting *Batson*, 476 U.S. at 102, 106 S.Ct. at 1726, 90 L.Ed.2d at 91 (White, J., concurring)). Numerical evidence alone may be sufficient to establish a pattern of peremptory strikes against minority jurors, but a defendant must show that "his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group." *Wheeler*, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905.

Defendant argues that the prosecution challenged and removed sixty-seven percent of the Hispanics on the venire. That figure is inaccurate and self-serving. After the court excused juror Ramos for cause, four Hispanic jurors remained. The prosecutor used peremptory challenges to strike two of those jurors, Mayeda and Sanchez. Of the two remaining Hispanic jurors, defendant struck one, Joan Anderson, notwithstanding his belief that she was Hispanic.[6] Disregarding his own strike against a Hispanic juror, defendant concludes that the prosecutor struck two of three or sixty-seven percent of the Hispanics from the venire. Under this method of calculation, defense counsel might have used a peremptory challenge to strike juror Galvez and then accused the prosecution of striking, not sixty-seven, but one hundred percent of the Hispanics from the venire.

A defendant cannot exercise a peremptory strike against a Hispanic juror and then rely on the reduced number of Hispanic jurors remaining on the venire to calculate the percentage of such jurors that have been previously excluded by the prosecution. Such a practice skews the resulting percentage in favor of the defendant, not because the prosecution has challenged more minority jurors, but because the defendant has reduced the number in the class.[7] This

---

of erroneously identifying a person's ethnicity also becomes much greater when the number of people involved is in the tens rather than the thousands.

*United States v. Esparsen*, 930 F.2d 1461, 1467 (10th Cir.1991). It is "incumbent on counsel, however delicate the matter, to make a record sufficient to preserve ... for review" the racial or ethnic identity of jurors excluded by peremptory challenge. *People v. Wheeler*, 22 Cal.3d 258, 583 P.2d 748, 752, 148 Cal.Rptr. 890, 894 (1978); *see Mejia v. State*, 328 Md. 522, 616 A.2d 356, 362 n. 8 (1992) (requiring counsel to make a detailed statement on the record setting out "bases for concluding that a particular person is a member of a particular ethnic or racial group").

6. Based on Joan Anderson's appearance, the trial court and counsel considered her to be Hispanic. We will treat her as such for purposes of this appeal. However, we note that physical characteristics associated with race or ethnicity are not by themselves a reliable indicia of membership in a cognizable group. *State v. Harrison*, 805 P.2d 769, 776–77 (Utah Ct.App.1991) (for *Batson* purposes, Hispanic appearance *and* an Hispanic surname proved membership in a cognizable ethnic group). In the case before us, neither the court nor the prosecutor recognized Joan Anderson as Hispanic until defense counsel specifically stated that she "appears to be Hispanic."

Likewise, an Hispanic surname by itself may not indicate group membership since a non-Hispanic woman may take the name of her Hispanic husband. *See Aguilar v. State*, 826 S.W.2d 760, 762 (Tex.Ct.App.1992) ("The fact that a venire-member has married a person of a particular race does not then automatically categorize that individual as a member of their spouse's race."); *Rodriguez v. State*, 819 S.W.2d 920, 926 (Tex.Ct. App.1991) (Spanish surnames alone did not establish that challenged jurors were Hispanic). In stating that "Hispanics or Spanish *surnamed* persons are a 'cognizable racial group' for purposes of equal protection analysis under *Batson*," *Cantu*, 750 P.2d at 596, we meant that Hispanics were a cognizable ethnic group, not that membership in that group could be established by surname alone.

7. The trial court agreed. The following exchange took place between the trial court and counsel:

DEFENSE COUNSEL: There are three Hispanics and you [the prosecutor] eliminated two-thirds. You consciously did that with your first and fifth pre-emptory [sic].

PROSECUTOR: Not based on any personality or anything like that. You've alleged there are four [Hispanic jurors]. You took one off, I had taken half of them off and you took a quarter of them off. . . .

is unacceptable, particularly because of the small numbers from which these percentages are calculated. When Joan Anderson is included in the calculation, the prosecution struck not sixty-seven, but *fifty* percent of the Hispanic jurors from the venire. Excluding two of four is not "most or all" of the Hispanic jurors on the panel. Moreover, the prosecutor did not use a disproportionate number of his peremptory challenges to strike Hispanics. The court dismissed fourteen jurors for cause and excused three others, leaving a sixty-person venire, seven percent of which was Hispanic. The prosecution used only seventeen percent of its peremptory challenges (two of twelve) to strike Hispanic jurors. Standing alone, defendant's numerical evidence is insufficient to prove a prima facie case of purposeful discrimination.

 Defendant seeks to bolster this evidence with the fact that he and jurors Mayeda and Sanchez are Hispanic. The "mere fact that the subject of the peremptory strike is a minority member does not alone raise the inference of discriminatory intent." *Cantu,* 750 P.2d at 597. However, racial or ethnic "identity between the defendant and excused prospective jurors" may make it easier to prove a prima facie case. *Powers v. Ohio,* 499 U.S. 400, ——, 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411 (1991); *see Wheeler,* 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 906 (the fact that a defendant is a member of the challenged jurors' racial or ethnic group and that the victim is a member of the group "to which the majority of remaining jurors belong" is relevant to establishing a prima facie showing of purposeful discrimination). The inference of discrimination that might be drawn from this racial or ethnic identity, however, is undercut by the fact that three of the prosecutor's key witnesses were Hispanic. *Hernandez v. New York,* 500 U.S. 352, ——, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395, 412 (1991). It is

certainly arguable that Hispanic jurors might be prone to find credibility in the prosecutor's Hispanic witnesses. This being the case, the prosecution suffered the same harm of which defendant complains when defense counsel struck Joan Anderson from the venire.

Concluding on these facts that defendant failed to make a prima facie showing was not beyond the limits of reasonability. Defendant did not establish a "pattern of strikes" against minority jurors, nor did he point to discriminatory statements or questions by the prosecutor during voir dire. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. It is true that the prosecutor excluded two of four jurors belonging to defendant's ethnic group. However, this does not of necessity raise a "strong likelihood" that the jurors were challenged because of their group membership, especially where three key witnesses for the prosecution shared the same ethnicity as the excluded jurors. We find no abuse of discretion.

Because defendant failed to make a prima facie showing, the burden of proof did not shift to the prosecutor. We therefore need not consider the adequacy of the race-neutral reasons proffered by the prosecutor.[8]

## SUFFICIENCY OF THE EVIDENCE

Defendant was convicted of first degree murder as defined in section 76–5–202(1)(b) of the Utah Code. That provision reads:

(1) Criminal homicide constitutes murder in the first degree if the actor intentionally or knowingly causes the death of another under any of the following circumstances:

(a) . . . .

(b) The homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons are killed.

---

COURT: [B]ut the point of it is, you [defense counsel] don't take yours off and reduce the then number available to three and accuse him [prosecutor] of taking two-thirds of them off. He took half of the Hispanics that were available off. He didn't take two-thirds of them. That's what I'm saying to you.
DEFENSE COUNSEL: Okay.

8. After ruling that defendant failed to make a prima facie showing, the trial court requested that the prosecutor put on his race-neutral reasons for excluding jurors Mayeda and Sanchez. The prosecutor did so, not because the burden of proof had shifted to the State, but because the court wanted to "make this complete for the record."

Defendant contends that there was insufficient evidence to support the existence of the aggravating circumstance in paragraph (b) of section 76–5–202(1). He insists that the entire fight lasted only minutes and therefore no evidence supported the existence of a "plan, scheme or criminal objective" to kill Shayne and Don Newingham. Defendant also contends that the "criminal episode" provision applies only to "single defendants committing a series of criminal offenses." If this were the case, the provision would be inapplicable because the jury acquitted defendant of the murder of Shayne Newingham. We reject these arguments.

When a jury verdict is challenged on the ground that the evidence is insufficient, we "review the evidence and all inferences which may be reasonably drawn from it in the light most favorable to the verdict of the jury." *State v. Hamilton*, 827 P.2d 232, 236 (Utah 1992). We will not reverse a conviction unless "the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *Id.*

On the evidence, a jury could have concluded beyond a reasonable doubt that defendant murdered Don Newingham "incident to one . . . criminal episode during which two or more persons [were] killed." Utah Code Ann. § 76–5–202(1)(b). To convict under the criminal-episode portion of section 76–5–202(1)(b), the jury must have concluded that (1) the conduct giving rise to the deaths of Shayne and Don Newingham was closely related in time, and (2) the conduct was incident to an attempt or an accomplishment of a single criminal objective. The evidence supports the jury verdict.

Defendant concedes that the fighting lasted about five minutes. Therefore, the conduct giving rise to the deaths of Shayne and Don Newingham was "closely related in time." *See generally State v. Valdez*, 748 P.2d 1050, 1052, 1054 (Utah 1987) (two homicides committed during a ninety-minute period held to be part of one criminal episode). However, contrary to defendant's contention, the definition of "criminal episode" does not require that the criminal objective be murder. In this case, defendant brandished a large-bladed knife and ordered a reluctant Don Newingham to leave the premises. Flanked by some fifteen to twenty other individuals, defendant and Gabaldon followed Don to the car, where Gabaldon struck him in the face. When Don fought back, defendant jumped on his back and stabbed him to death. The single criminal objective in these assaults was group action to remove two uninvited guests from Gabaldon's residence by means of unlawful and violent force, which could have, and did, result in the intentional deaths of two persons. *See* Utah Code Ann. §§ 76–5–102, 76–5–103.[9]

Finally, there is no requirement that a defendant kill the "two or more" persons referred to in section 76–5–202(1)(b) or that a defendant kill one person and be a party to the murder of the others. The killings must occur during one act, scheme, course of conduct, or criminal episode, but the defendant need only be responsible for one of them. This is the case here. During the above-described criminal episode, defendant stabbed Don Newingham four times, killing him. During or within minutes of this act, Shayne Newingham suffered multiple stab wounds which caused his death. Thus, defendant caused the death of Don Newingham "incident to one . . . criminal episode during which two or more persons [were] killed." Utah Code Ann. § 76–5–202(1)(b). From the record, we cannot conclude that the evidence

9. Section 76–5–102 reads in part:
 (1) Assault is:
 (a) . . .;
 (b) a threat, accompanied by a show of immediate force or violence, to do bodily injury to another; or
 (c) an act, committed with unlawful force or violence, that causes bodily injury to another.
 Section 76–5–103 reads:

 (1) A person commits aggravated assault if he commits assault as defined in Section 76–5–102 and he:
 (a) intentionally causes serious bodily harm to another; or
 (b) uses a dangerous weapon as defined in Section 76–1–601 or other means of force likely to produce death or serious bodily injury.

is so "inconclusive or inherently improbable" that reasonable minds would have entertained a reasonable doubt that defendant committed first degree murder in violation of section 76–5–202(1)(b). The evidence is sufficient to support the verdict.

## JURY INSTRUCTION THAT DISREGARDED AN ELEMENT OF THE CRIME OF FIRST DEGREE MURDER

Defendant argues that the trial court improperly instructed the jury on the elements of first degree murder. Paragraph three of instruction eleven described the aggravating factor in section 76–5–202(1)(b) of the Utah Code. It read as follows:

That Fred A. Alvarez caused said death under circumstances where the homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons are killed.

During deliberations, the jury asked the court, "In instruction no. 11 element [paragraph] no. 3 [sic] Do you need to satisfy all elements listed or just one?" The court responded, "Any single element set forth in paragraph no. 3 of instruction no. 11 is sufficient." Defendant argues that paragraph three actually contains two requirements—first, that the death was caused under circumstances where the homicide was committed incident to one act, scheme, course of conduct, or criminal episode, and second, that two or more persons were killed. He contends that "[b]y telling the jury that only one of the parts or elements of that third paragraph need be established, the trial court essentially told the jury that the State need to prove only that two or more persons were killed."

■ As a general rule, a "contemporaneous objection or some form of specific preservation of claims of error must be made a part of the trial court record before an appellate court will review such a claim on appeal." *State v. Johnson*, 774 P.2d 1141, 1144–45 (Utah 1989). Defendant made no objection to this instruction at trial. Therefore, he has failed to preserve the issue for appeal.

## CHALLENGES TO SECTION 76–3–203.1

■ Defendant levels a barrage of constitutional challenges to section 76–3–203.1 of the Utah Code pursuant to which the trial court imposed a minimum mandatory sentence of twenty years in prison. Utah Code Ann. § 76–3–203.1 (Supp.1993). We conclude, however, that these challenges were not properly preserved for appeal. In his motion to strike defendant's minimum mandatory sentence under section 76–3–203.1, defense counsel merely stated that the section was "unconstitutionally vague and consequently denies the defendant due process of law as guaranteed by the state and federal constitutions." At the sentencing hearing, defense counsel renewed this general objection and added a separation of powers argument:

With respect to [section 76–3–203.1]. . . . As the offense is now presently determined, that enhancement is twenty years. I think I need to perfect the record in behalf of Mr. Alvarez in that regard. There are Constitutional arguments that need to be preserved regarding the vagueness in the relegation of legislative function to the Judicial and Executive branches and applying . . . Federal and State standards 76–3–203.1 is unconstitutional.

A defendant cannot preserve issues for appeal by generally objecting or nominally invoking the state and federal constitutions. As stated above, a "contemporaneous objection or some form of *specific* preservation of claims of error must be made a part of the trial court record before an appellate court will review such a claim on appeal." *Johnson*, 774 P.2d at 1144–45 (emphasis added). For this reason, we do not address defendant's constitutional arguments.

■ Only one of defendant's challenges regarding section 76–3–203.1 is properly before us. He contends that the trial court clearly erred in finding that defendant acted "in concert with two or more persons" under section 76–3–203.1. "The correct interpretation of a statute is a question of law and is reviewed for correctness." *State v. Larsen*, 865 P.2d 1355, 1357 (Utah 1993). Factual findings, on the other hand, will not be reversed absent clear error. To prove findings

of fact clearly erroneous, "an appellant must marshal all evidence in favor of the facts as found by the trial court and then demonstrate that even viewing the evidence in a light most favorable to the court below, the evidence is insufficient to support the findings of fact." *Saunders v. Sharp,* 806 P.2d 198, 199–200 (Utah 1991).

 Section 76–3–203.1, commonly known as the "gang enhancement" provision,[10] reads in part:

(a) A person who commits any offense listed in Subsection (3) in concert with two or more persons is subject to an enhanced penalty for the offense as provided below.

(b) "In concert with two or more persons" as used in this section means the defendant and two or more other persons would be criminally liable for the offense as parties under Section 76–2–202.

Utah Code Ann. § 76–3–203.1(1)(a)–(b). Section 76–2–202 reads:

Every person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct.

Utah Code Ann. § 76–2–202. Defendant makes the plausible argument that under section 76–3–203.1, the persons with whom he acted in concert must be parties to the offense of first degree murder and possess the mental state required for that offense—intentionally or knowingly causing the death of another. The statute admits of this interpretation because "[i]n concert with two or more persons" means that "two or more other persons would be criminally liable for *the offense* as parties." Utah Code Ann. § 76–3–203.1(1)(b) (emphasis added). The words

"the offense" in subpart (1)(b) appear to refer to the offense for which defendant is being sentenced under subpart (1)(a). Defendant argues that no other participant in the fight, with the exception perhaps of Tony DeHerrera, had the requisite mental state to make them parties to the offense of first degree murder. Therefore, the argument continues, the factual finding that defendant acted "in concert with two or more persons" was not supported by the record and clearly erroneous.

 While defendant's interpretation of section 76–3–203.1 is plausible, it is not correct. For section 76–3–203.1 to apply, a defendant must act in concert with two or more persons who would be criminally liable as parties under section 76–2–202. Party liability under section 76–2–202 does not require that the persons involved in the criminal conduct have the same mental state. We wrote in *State v. Crick,* 675 P.2d 527 (Utah 1983):

A defendant can be criminally responsible for an act committed by another, *but the degree of his responsibility is determined by his own mental state* in the acts that subject him to such responsibility, not by the mental state of the actor. This is clear from the language of § 76–2–202.

*Id.* at 534. Thus, three persons can be parties to the same criminal conduct and each have a different mental state. This rule is consistent with subsection (5)(b) of section 76–3–203.1, which provides:

It is not a bar to imposing the enhanced penalties under this section that the persons with whom the actor is alleged to have acted in concert are not identified, apprehended, charged, or convicted, *or that any of those persons are charged with or convicted of a different or lesser offense.*

(Emphasis added.)

In the instant case, the trial court found that defendant acted "in concert with" Mar-

---

10. Referring to section 76–3–203.1 as a sentence "enhancement" is not technically accurate. The minimum terms imposed under that section do not exceed the maximum terms available by statute for the enumerated crimes to which section 76–3–203.1 applies. For example, a defendant convicted of a first degree felony may be sentenced to a term of "not less than five years ... and which may be for life." Utah Code Ann. § 76–3–203. For first degree felonies, section 76–3–203.1 provides for a nine-year minimum term. Similarly, a defendant convicted of a second degree felony may be sentenced to a term of one to fifteen years. Utah Code Ann. § 76–3–203. For second degree felonies, section 76–3–203.1 requires a minimum term of six years. For this reason, we refer to defendant's "enhancement" as a twenty-year minimum mandatory sentence.

tinez, Manuel Alvarez, DeHerrera, and "others unknown" to commit the criminal assaults that caused the deaths of Don and Shayne Newingham. This finding is supported by the evidence, and we cannot deem it clearly erroneous. The jury determined that defendant "knowingly and intentionally" caused the death of Don Newingham. The fact that the other participants may have possessed lesser mental states does not mean that they did not act as parties to the criminal assaults and therefore "in concert with" defendant.

## CONCLUSION

For these reasons, we affirm defendant's first degree murder conviction, his life sentence, and the twenty-year minimum mandatory imposed by the trial court.

HALL, C.J., concurs.

ZIMMERMAN, Chief Justice, concurring:

I concur in the result reached by Justice Howe and join in all of his opinion except the portion of the discussion that considers the merits of defendant's *Batson* challenge and the portion discussing death qualification of the jury. With respect to the *Batson* point, I would hold that defense counsel failed to preserve an adequate record of the ethnicity of the jurors struck from the panel so as to permit a meaningful *Batson* analysis. *See State v. Cantu,* 778 P.2d 517, 518 (Utah 1989).

Regarding death qualification, I first note that the death qualification discussions in the lead opinion in *State v. Young* relied on by Justice Howe did not garner a majority of this court's members. 853 P.2d 327 (Utah 1993) (plurality opinion). One member of the court would have found death qualification unconstitutional. 853 P.2d at 394–95 (opinion of Durham, J.). Justice Stewart and I concurred as to the result reached by Chief Justice Hall, but we did not categorically reject all challenges to death-qualified juries. 853 P.2d at 414–16 (opinion of Zimmerman, J.); *id.* at 418 (opinion of Stewart, J.). Rather, we said that we would not disturb the existing practices absent clearer scientific evidence about the effects of death qualifica-

tion. *Id.* Since no such evidence has been forthcoming, I continue to adhere to the result in *Young* and would reject, on the basis expressed in that case, Alvarez's similar challenge here.

STEWART, Associate C.J., concurs in the concurring opinion of ZIMMERMAN, C.J.

DURHAM, Justice, concurring and dissenting:

I concur in Justice Howe's opinion except for the section labeled "Death Qualifying the Jury." With respect to that analysis, I continue to rely on the position I took in *State v. Young,* 853 P.2d 327 (Utah 1993) (Durham, J., dissenting):

> Given the dual forms of conviction-proneness that death qualification causes, both from the impact of the process on those jurors who survive it and from the exclusion of an entire class of potential jurors, I would hold that death qualification prior to the guilt phase violates the Utah Constitution, article I, sections 7, 10, and 12.

*Id.* at 394.

HALL, J., acted on this case prior to his retirement.