1999 UT 60

**STATE of Utah, Plaintiff and Appellee,**

v.

**Jorge Martin BENVENUTO, Defendant and Appellant.**

No. 980155.

Supreme Court of Utah.

June 18, 1999.

Jan Graham, Att'y Gen., Joanne C. Slotnik, Asst. Att'y Gen., Robert Stott, Roger Blaylock, Salt Lake City, for plaintiff.

Robert L. Booker, David H. Tolk, Salt Lake City, for defendant.

RUSSON, Justice:

¶ 1 Defendant Jorge Martin Benvenuto appeals the district court's denial of his motion to withdraw his guilty plea. Benvenuto pled guilty to one count of aggravated murder and one count of attempted aggravated murder. Benvenuto then moved to withdraw his plea. The district court held a hearing, ruled that Benvenuto did not have good cause to withdraw the plea, and denied the motion. We affirm.

## BACKGROUND

¶ 2 On the evening of August 28, 1996, eighteen-year-old Zachary Snarr and his friend Yvette Rodier drove to Little Dell Reservoir in Salt Lake County. As they parked off the road, they noticed a white truck pull up nearby. Taking a blanket, camera, and tripod, they walked partway down a footpath and prepared to take photographs of the moon. As Zachary and Yvette spread out the blanket and sat down, Benvenuto approached from behind and asked them a brief question about where the path went. Yvette replied that she did not know. When Yvette and Zachary turned their attention away from him, Benvenuto fired several shots at point-blank range with a handgun, hitting both Yvette and Zachary. Two bullets struck Zachary in the head, and one hit him in the abdomen; he died at the scene. Yvette survived the initial wounds she received and started screaming. Approximately thirty seconds after the first volley of shots, Benvenuto fired more shots at Yvette. He then searched both victims' pockets, took Zachary's keys, and left in Zachary's car. Although Yvette suffered multiple bullet wounds to her head, one to her shoulder, one to her leg, and two to her torso, she survived.

She managed to crawl several hundred feet up to the highway, where a passing motorist saw her and stopped. Upon being notified of the crime, police officers arrived at the scene and found a white vehicle at the roadside pullout where Zachary and Yvette had parked. The vehicle was registered to Benvenuto. When police officers located Benvenuto and interviewed him, he confessed to the crime and expressed surprise that Yvette had survived his assault.

¶ 3 The State charged Benvenuto with aggravated murder (a capital homicide), attempted aggravated murder, and two counts of aggravated robbery. While his trial was pending, Benvenuto was incarcerated for a period of several months. Initially, he was housed in the mental health section of the Salt Lake County Jail on suicide watch. He received medication, and after a few months, his condition improved enough to allow him to be relocated in the general jail population.

¶ 4 The court appointed three attorneys from the Salt Lake Legal Defender's Association (LDA) to represent Benvenuto. A fourth LDA attorney was also appointed to assist with motions, mitigation issues, and sentencing. Three of the attorneys had prior experience representing clients charged with capital crimes. All four attorneys had extensive experience in representing clients charged with felonies and homicides and in dealing with clients who had mental health problems or whose competence to stand trial or enter a plea was questionable.

¶ 5 On November 7, 1996, Benvenuto's defense team petitioned for an inquiry into his competence to proceed. His attorneys consulted two mental health experts, Dr. Vickie Gregory, Ph.D., J.D., a forensic psychologist, and Dr. Breck Lebegue, M.D., J.D., a forensic psychiatrist. Dr. Gregory and Dr. Lebegue examined Benvenuto and provided their opinions to Benvenuto's defense team. After reviewing the opinions, the defense chose to withdraw Benvenuto's petition. On approximately October 9 or 10, 1997, the State offered a plea agreement. One of Benvenuto's attorneys requested an updated evaluation from Dr. Gregory before presenting the proposed plea agreement to Benvenuto. Dr. Gregory noted that Benvenuto was somewhat depressed but that there was nothing in his mental condition that would prevent him from entering a knowing and voluntary plea. The defense team then consulted extensively with Benvenuto regarding the nature and consequences of the proposed plea agreement.

¶ 6 On October 15, 1997, Benvenuto entered a guilty plea to the counts of aggravated murder and attempted aggravated murder. In exchange for the plea, the State agreed to dismiss the robbery charges and not to seek the death penalty. Although the plea agreement contained no formal sentencing recommendation for the aggravated murder charge, the trial court made a verbal commitment—based on its discussion with the attorneys for both parties and the expressed wishes of the victims' families—to impose life without the possibility of parole if such a sentence was properly supported during the sentencing phase.

¶ 7 Prior to accepting Benvenuto's plea, the trial court conducted a full colloquy pursuant to rule 11 of the Utah Rules of Criminal Procedure. The court first inquired as to the nature and scope of the information Benvenuto's attorneys had presented to him and Benvenuto's responses to that information. In particular, the court asked one of Benvenuto's attorneys, James A. Valdez, if he believed that Benvenuto was "offering a guilty plea voluntarily, knowingly, and with full understanding of his rights and the consequences of his actions here today." Valdez replied: "Yes, your honor. Mr. Benvenuto is quite an intelligent young man, and although there are some mental health issues that we know were present, he is quite capable of understanding everything that is going on today and exactly what he is doing today."

¶ 8 During the subsequent colloquy with Benvenuto, the court asked if he was being treated for any medical or mental conditions. Benvenuto definitively answered that he was not. Benvenuto's responses to all other questions were equally clear and forthright. There is no indication in the transcript of any indecision or equivocation regarding his plea decision, and Benvenuto never indicated to either the court or his counsel any feelings or

conditions that would detract from his ability to enter a knowing and voluntary plea.

¶ 9 After entering the plea but before formal imposition of a sentence, Benvenuto engaged new counsel and timely moved to withdraw his plea. On January 16, 1998, the district court held an evidentiary hearing on the motion. The defense relied on Benvenuto's own testimony and that of two of his siblings. The gist of this testimony was that Benvenuto had been confused and depressed at the time he entered his plea. Benvenuto asserted that he would not have pled guilty if he had not been confused and depressed. Benvenuto argued that his counsel's failure to disclose the full extent of his prior mental health history to the court and the court's failure to sua sponte conduct extensive questioning about his mental state and condition at the time of the plea constituted good cause to withdraw the plea. The district court rejected Benvenuto's arguments and denied the motion to withdraw. In support of its ruling, the district court entered extensive findings of fact and conclusions of law. The court sentenced Benvenuto to life in prison without the possibility of parole. This appeal followed.

## DISCUSSION

■ ¶ 10 "We review a trial court's denial of a motion to withdraw a guilty plea under an 'abuse of discretion' standard, incorporating the 'clearly erroneous' standard for the trial court's findings of fact made in conjunction with that decision." *State v. Holland*, 921 P.2d 430, 433 (Utah 1996) (citing *State v. Blair*, 868 P.2d 802, 805 (Utah 1993)). "However, the ultimate question of whether the trial court strictly complied with constitutional and procedural requirements for entry of a guilty plea is a question of law that is reviewed for correctness." *Id.; see also State v. Thurman*, 911 P.2d 371, 372 (Utah 1996).

■ ¶ 11 The procedures for entering a guilty plea are set forth in rule 11 of the Utah Rules of Criminal Procedure. "Rule 11(e) squarely places on trial courts the burden of ensuring that constitutional and Rule 11(e) requirements are complied with when a guilty plea is entered." *State v. Gibbons*, 740

P.2d 1309, 1312 (Utah 1987). This "strict compliance" rule requires the trial court to establish (1) that "the defendant's guilty plea is truly knowing and voluntary," and (2) that "the defendant knowingly waived his or her constitutional rights and understood the elements of the crime." *State v. Abeyta*, 852 P.2d 993, 995 (Utah 1993).

¶ 12 In this case, Benvenuto does not assert that he was incompetent to enter a plea. *Compare Holland*, 921 P.2d at 434 (mental conditions, including depression, rendered defendant incompetent to plead guilty) *and State v. Romers*, 159 Ariz. 271, 766 P.2d 623, 628 (Ct.App.1988) (where severe depression potentially affected defendant's competency, plea permitted to be withdrawn) *with Johnson v. United States*, 633 A.2d 828, 833 (D.C. 1993) (judge properly found defendant competent to plead guilty notwithstanding allegations of mental difficulties relating to depression) *and State v. Comer*, 584 A.2d 638, 642–43 (Me.1990) (allegation of depression did not justify withdrawal of plea where record evidence showed defendant was competent at time of plea). Rather, he contends that he was depressed at the time he entered his plea and that this condition impaired his judgment to such an extent that he was not capable of entering a truly voluntary plea. He likens the impairment caused by mild or moderate depression to the effects of alcohol or chemical intoxicants.

¶ 13 The trial court investigated this claim at the evidentiary hearing on Benvenuto's motion to withdraw. At the conclusion of the hearing, the court denied the motion to withdraw and entered extensive findings of fact to support its ruling. As noted above, we do not overturn factual findings supporting a denial of a motion to withdraw unless they are clearly erroneous. *See Holland*, 921 P.2d at 433. Because Benvenuto has made no attempt to marshal the evidence supporting the trial court's decision and demonstrate that such evidence is insufficient to support the court's findings of fact, we accept the trial court's findings as stated in its ruling. *See State v. Alvarez*, 872 P.2d 450, 460–61 (Utah 1994).

¶ 14 The events surrounding the entry of Benvenuto's guilty plea and the actions of his defense team strongly support the court's ruling. The court found that Benvenuto's attorneys had been scrupulously attentive to Benvenuto's mental condition from the time they were appointed. They consulted with him frequently during the several months preceding his decision to plead guilty and almost daily during the week prior to his entry of the plea. Commenting on this attentiveness, the court noted that "there was nothing uncommon or deficient about Mr. Valdez' mere mention of 'some mental health issues' [during the plea colloquy] because Mr. Valdez had no reason to believe Mr. Benvenuto's mental condition in any way impaired his ability to enter a voluntary, knowing and intelligent plea."

¶ 15 Attorney Valdez's testimony at the hearing on the motion to withdraw supported the court's denial of Benvenuto's motion. Valdez conceded that he was not a mental health professional and was not qualified to offer a diagnosis of the severity of Benvenuto's depression. Nevertheless, his extensive experience in defending persons accused of serious crimes allowed him to offer relevant information based on his personal observations of Benvenuto's actions and conduct. Valdez stated that he was concerned about Benvenuto's mental state because Benvenuto had made statements shortly after being arrested indicating that he desired to receive the death penalty. Valdez interpreted this expression as a suicidal tendency. The staff at the Salt Lake County Jail placed Benvenuto in the mental health section on suicide watch for approximately three months until he improved sufficiently to be placed within the general jail population. Thereafter, Benvenuto exhibited some signs of depression, but Valdez did not perceive those signs as being peculiar or extreme for a person in Benvenuto's circumstances.

¶ 16 When the plea was proposed, Benvenuto understandably found the decision confusing and difficult. Valdez testified that he perceived nothing unusual about Benvenuto's difficulties in making the decision because anyone faced with the choice of going to trial for capital murder or pleading guilty and receiving life without the possibility of parole likely would be depressed and upset. Benvenuto's attorneys advised him to take the plea bargain because, as Valdez stated, they believed that the possibility of Benvenuto's being convicted if he stood trial was very strong; and if Benvenuto was convicted at trial, he would be exposed to the death penalty. During the time when Benvenuto was considering whether to accept the plea agreement, he indicated to his brother and sister that the information his attorneys were giving him about the strength of the State's case left him with little choice but to accept the plea agreement.

¶ 17 In the days leading up to the final plea colloquy, Benvenuto apparently vacillated between the two options of going to trial and accepting the State's plea offer. Valdez testified that it is common in such cases for defendants to "go back and forth until they finally make the decision they are going to make, which is a grave decision to make." Indeed, on the morning when the parties anticipated Benvenuto would enter a guilty plea, and when all interested persons had assembled for that purpose, Benvenuto elected to take more time to think about his decision. Later that afternoon, he decided to accept the State's offer, and the court reconvened to take his guilty plea.

¶ 18 Benvenuto's behavior did not demonstrate an extremely fatalistic or indifferent attitude about punishment, which is the implication raised by Benvenuto's assertion that his depression impaired his judgment. Instead, the inference raised by the evidence is that Benvenuto was genuinely agonizing over his decision. The unpalatable prospects Benvenuto faced would inflict some level of depression on most persons confronting the same.

¶ 19 The trial court also relied on the opinions of several mental health professionals in making its finding that Benvenuto's depression was not so severe as to render his plea unknowing or involuntary. Several months before Benvenuto pled guilty, both Dr. Gregory and Dr. Lebegue concluded that Benvenuto was competent to assist in his

own defense.[1] Dr. Gregory then re-interviewed Benvenuto only a few days before the guilty plea. According to the court's findings, Dr. Gregory found "nothing about [Benvenuto's] mental condition that would prevent him from entering a knowing and voluntary plea."

¶ 20 Further, in conjunction with Benvenuto's hearing on his motion to withdraw his plea, Benvenuto's new counsel obtained a report by Dr. Nancy B. Cohn. Dr. Cohn holds a Ph.D. and is a licensed psychologist. She interviewed Benvenuto on December 25, 1997, approximately two months after Benvenuto entered his plea. Her interview focused on Benvenuto's contemporaneous mental state and his mental state at the time he entered his plea. Dr. Cohn opined that Benvenuto suffered from mild to moderate depression, but she found no other psychological issues relevant to his competence to enter a plea. She concluded that Benvenuto's "depression did not significantly affect his capacity to understand the details of the plea agreement, or the implications of entering such a plea."[2]

¶ 21 The court also referred to its own observations of the plea agreement. The court stated that Benvenuto "exhibited no signs of depression; he appeared focused and attentive and gave appropriate and rational responses to all questions." The court observed "no confusion on the part of Mr. Benvenuto during the plea hearing" and stated that his "demeanor and affect at all [of the many] hearings [relating to his case] has been very consistent and he has never once appeared to be disoriented or unable in any way to comprehend the proceedings." The court further noted that at the plea hearing Benvenuto "appeared to be of sound and discerning mind, [and] free of any mental defect, illness or impairment that would have prevented him from entering a voluntary, knowing and intelligent plea."

¶ 22 Benvenuto offered no substantial evidence to rebut the conclusion that his plea was voluntary. Indeed, the evidence Benvenuto presented was largely consistent with the observations of all other persons who testified about his mental condition. Benvenuto's sister and brother testified as to their interactions with him in the days immediately preceding and immediately following his guilty plea. Benvenuto's sister testified that she had spoken to him on the phone shortly after the proposed plea agreement had been presented to him. She perceived him to be confused, sad, and disappointed. She stated that Benvenuto's attorneys had apparently advised him to take the plea, but she felt he should not agree to it and should go to trial instead. She was surprised when she found out he had pled guilty. Benvenuto's brother offered similar testimony, indicating that Benvenuto had difficulty in making the decision about whether to accept the plea. Even Benvenuto's own testimony to support his motion to withdraw merely stated that he was feeling a "bit down" or "withdrawn [and] depressed." The relevant testimony at the hearing demonstrated that such feelings are not unusual for someone in Benvenuto's situation and do not suffice as grounds to withdraw a plea. *See, e.g., United States v. Guthrie*, 64 F.3d 1510, 1513–14 (10th Cir.1995) (defendant's failure to take antidepressant medication did not render plea involuntary or interfere with understanding of charges against him).

## CONCLUSION

¶ 23 The district court's findings clearly supported its conclusion that Benvenuto en-

---

1. Although Benvenuto does not assert that he was at any time incompetent, the determination of competency is relevant to the extent that it demonstrates Benvenuto was capable of manifesting an interest in his own defense and a willingness to participate in that defense.

2. Dr. Cohn's specific diagnosis stated:
   In summary, the defendant is an individual with a long history of psychological difficulties, who does not presently demonstrate psychotic symptoms (and likely does *not* have a history of psychotic disorder) but who at his baseline is mildly to moderately depressed. Despite such diagnostic considerations, the defendant has no significant impairment in his understanding of the proceedings against him and understands the punishment specified for the offenses charged. At the time he entered his plea, he was undoubtedly confused and distressed, but not in a way that would impair his reality testing, or his ability to understand the implications of his entering a plea.
   (Emphasis in original.)

tered a voluntary and knowing plea. There is no basis for us to hold that the court abused its discretion in denying Benvenuto's motion to withdraw his plea. We affirm.

¶ 24  Chief Justice HOWE, Associate Chief Justice DURHAM, Justice STEWART, and Justice ZIMMERMAN concur in Justice RUSSON's opinion.

